## Guillou *versus* Peterson.

1. A., B. and C. were in partnership. C., who was a special partner, by a failure to comply with the law regulating limited partnerships, became a general partner as to the public, but remained a special one as to his partners. B., who was the executor of an estate, loaned certain of its securities to the firm and they were converted to the firm use. There was evidence that C. knew of at least one loan made by B. to the firm. *Held*, that although there was no evidence to show that C. participated in or knew of the fraudulent conversion he was liable as a general partner to the estate.

2. The fact that B. knew of the limited liability of C. would not bind the estate for which he was acting and prevent recovery against C. An executor can only bind his *cestui que trust* when acting within the scope of his authority.

3. The knowledge of C. as to the irregular loan made by B. was sufficient to put him on inquiry as to the manner in which the business of the firm was being conducted.

February 14th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Error to the Court of Common Pleas, No. 2, of *Philadelphia county:* Of July Term 1876, No. 125.

Assumpsit by René Guillou, administrator c. t. a. of the estate of Samuel L. Haven, deceased, against Edward W. Gould, Theodore R. Strong, Jesse White, Jr., and Pearson S. Peterson, late copartners as Gould, Strong & Co.

Plaintiff filed a *narr.* in the common counts, and claimed to recover,

1. The sum of $28,437.50, being the proceeds of $25,000 United States 5-20 bonds, belonging to the estate of Samuel L. Haven, deceased, which were sold, on or about December 14th 1871, by the firm of Gould, Strong & Co., of which defendant Peterson was a member, and the proceeds thereof applied by them to their own use; together with interest on the said sum of $28,437.50, from the 14th of December 1871.

2. The sum of $45,314.09, being the proceeds of four hundred and seventy-one shares of the stock of the Pittsburgh, Fort Wayne and Chicago Railroad Company, belonging to the said estate, which were sold on or about January 22d and 25th 1872, by the said firm, and the proceeds thereof applied by them to their own use; together with interest on the said sum of $45,314.09 from the 25th January 1872.

Defendant Peterson, who alone was served with process, pleaded non assumpsit, and a special plea as follows:

And the said defendant saith that said plaintiff ought to be barred from prosecuting his aforesaid suit, because he saith that at the time in said declaration mentioned, he, the said defendant, was a special partner of the firm of Gould, Strong & Co., under a contract of partnership, pursuant to the provisions of title 1, chap. 4,

[Guillou *v.* Peterson.]

part 2, of the Revised Statutes of New York, and of the several acts amendatory thereof, for the transaction of a banking and brokerage business within the state of New York, and that by said statute it is enacted that no special partner shall be liable for any loss beyond the amount of capital contributed by him. And the said defendant avers that he contributed in cash to said copartnership the sum of $20,000, as special capital, and before suit brought hath wholly lost the same, and of this he is ready to verify.

To which the plaintiff filed a traverse of the special partnership, and joined issue.

Some of the provisions of the New York statutes in reference to special partners are as follows:

"Such partnerships may consist of one or more persons, who shall be called general partners, and who shall be jointly and severally responsible as general partners now are by law; and of one or more persons who shall contribute, in actual cash payments, a specific sum as capital, to the common stock, who shall be called special partners, and who shall not be liable for the debts of the partnership beyond the fund so contributed by him or them to the capital."

"Every renewal or continuance of such partnership, beyond the time originally fixed for its duration, shall be certified, acknowledged and recorded, and an affidavit of a general partner be made and filed, and notice be given, in the manner herein required for its original formation; and every such partnership which shall be otherwise renewed or continued, shall be deemed a general partnership."

"No part of the sum which any special partner shall have contributed to the capital stock shall be withdrawn by him, or paid or transferred to him, in the shape of dividends, profits or otherwise, at any time during the continuance of the partnership; but any partner may annually receive lawful interest on the sum so contributed by him, if the payment of such interest shall not reduce the original amount of such capital; and if, after the payment of such interest, any profit shall remain to be divided, he may also receive his portion of such profits."

The firm of Gould, Strong & Co. failed on January 16th 1872, in consequence of losses incurred in stock speculations. The remaining material facts will be found stated in the opinion of this court. Upon the facts as thus stated, the court below, Pratt, J., granted a nonsuit, and after a refusal to take it off, entered judgment for the defendant. The plaintiff then took this writ and assigned this action for error.

*Robert H. McGrath, Victor Guillou, Samuel Dickson* and *J. C. Bullitt*, for plaintiff in error.—The requirements of the Act of Assembly in reference to limited partnerships were not complied

[Guillou v. Peterson.]

with by the firm, and at the end of the first year, therefore, Peterson became a general partner.   Without these omissions on the part of the firm he would have become a general partner, on the change of the articles of copartnership in 1868, as carrying on business after such an alteration converts the partnership into a general one: Lachaise v. Marks, 4 E. D. Smith 610.

The action here is for money had and received by the defendant's firm.   The claim is based upon the receipt of the stocks and bonds by the firm; the use in their business for several years; the transfer of the stocks and the sale of the bonds by the firm, and the appropriation of the proceeds of both for the purposes of the copartnership.   If these facts are proven, we submit it is not material that they originally came into the possession of the firm by a fraud. The owners thereof, the plaintiffs, have a right to waive the tort, or adopt the sale and sue for the proceeds thereof which came into defendant's firm; and actual knowledge of the fiduciary character of the securities, on the part of each partner, is not necessary to hold him liable for the proceeds.

The misappropriation by Strong is not the foundation of the action; it is the appropriation of the proceeds by the firm.  See Marsh v. Keating, 2 Cl. & Fin. 250; Stone v. Marsh, 6 B. & C. 551; Sadler v. Lee, 6 Beavan 324.

It has been said that these cases are opposed by the decisions in Ex parte Heaton, Buck 386, Ex parte Apsey, 3 Bro. Ch. C. 265, Ex parte Watson, cited by Lindley on Partnership, page 327, but the facts of the cases are not analogous.   An examination of the latter cases will show that they were appropriations by the guilty partner to partnership purposes and not loans to the firm, or funds which fraudulently came into the possession of the firm and were then appropriated by the firm to their own use.

This was not a case of felony on the part of Strong.   The assets of the estate were in his hands as trustee rather than as executor, and the loan of trust securities, though made at the risk of the trustee, is not so wrongful as to defeat even his right of recovery.   It is no answer in case an executor or assignee continues a mercantile business, to an action by him for goods sold, that he is guilty of a breach of trust in dealing with the trust funds.   That is a question for his *cestui que trust.*   His legal title is perfect, and he can assert it against any one dealing with him.   Strong could, therefore, have maintained an action at law against the firm to recover these securities, if still in their hands, in his own name.   But if this were not so, the fraud of Strong was committed when he delivered to the firm the coupon bonds and assigned to them the stocks.   His act ceased then.   He did nothing thereafter.   Having committed the fraudulent act of loaning the trust assets to the firm, he did not afterward employ them in the partnership business, and this is the

[Guillou *v.* Peterson.]

material distinction in the facts of nearly every case in the books where knowledge is held necessary.

The ground of the action is the receipt by the firm of the proceeds of the sale of the securities. When a partner borrows money generally without saying for whom, the fact of its being used in the business of the partnership is prima facie evidence to sustain an action against the firm: Jacques *v.* Marquand, 6 Cowen 497. Where one partner in the firm name, but without the actual authority of his partners, obtains money and applies it to the use of the firm, the firm becomes liable the instant the application of the money to firm purposes is made. There is no distinction between the borrowing of money and of notes, where the note is taken for the purpose of receiving money upon it and such is actually received: Hogan *v.* Reynolds, 8 Ala. 60; Manufacturers' and Mechanics' Bank *v.* Gore & Co., 15 Mass. 75; Boardman *v.* Gore, 15 Id. 331; Harper *v.* Lamping, 33 Cal. 649.

Even if the liability of an individual partner is dependent upon his knowledge of the use of the assets of the estate by the firm, the defendant is liable to plaintiffs in this action, because—

He had actual knowledge that the firm had borrowed from Mr. Strong as executor, and was not informed, and did not inquire, whether the loans had been returned.

Were this not so, yet, being a general partner, notice to one is notice to all the partners, and the evidence is conclusive that defendant's three copartners knew of the said loans, and used the assets of the estate, respectively.

Both as a general partner and as a special partner, by the express provisions of the articles of copartnership, it was his duty to examine into the state and progress of the partnership, which would have disclosed the facts of these loans by the trustee-partner.

Knowledge of the use of these securities by the firm is to be imputed to the defendant, because each of said transactions being entered on the day of the occurrence, on the blotters of the firm, and afterwards on the ledger, ordinary diligence and attention to the business would have given him the knowledge.

If knowledge of fraud can be imputed to the other partners; if they knew, or ought to know, that trust moneys were being employed in the partnership business, they will be bound, &c., and will be liable for a breach of trust in case of their misapplication or loss: Lindley on Partnership, p. 249.

It is no answer to any of these arguments against defendant that he was defrauded and deceived by his partners. This cannot affect the claim of the plaintiff here: Marsh *v.* Keating, *supra;* Sadler *v.* Lee, *supra;* Bohlen's Estate, 25 P. F. Smith 304.

*Sharp & Alleman* and *David W. Sellers*, for defendant in error. —The defendant is not responsible for the use of the securities by

his partners, because his liability was limited by the articles of co-partnership, and Strong knew their terms, and Haven's estate is bound by Strong's knowledge which would prevent a recovery. There is no implied authority in one partner to bind another where by articles of co-partnership they expressly declared against being so bound: Feigley v. Sponeberger, 5 W. & S. 564; Yeager v. Wallace, 7 P. F. Smith 365; Spooner v. Thompson, 48 Vt. 259; Parsons on Partnership 95; Story on Partnership 128; Alderson v. Pope, 1 Campbell 404, note a; Batty v. McCundie, 3 C. & P. 202; Gallway v. Martiens & Smithson, 10 East 264. The use of the securities was an embezzlement which Peterson never sanctioned, and he is not liable therefor: Ex parte Heaton, Buck 386; Ex parte Apsey, 3 Bro. C. C. 265; Lindley on Partnership (ed. 1873), 327; Jacques v. Marquand, 6 Cowen 497; Clay v. Cottrell, 6 Harris 408; Grubb v. Cottrell, 12 P. F. Smith 28. To entitle a *cestui que trust* to recover against the firm it must be shown that all the parties were implicated in the breach of trust, and knew that the money did not belong to the parties who were making use of it. The securities were not borrowed upon the credit of the firm, and the defendant neither expressly nor impliedly assented to be liable for their value. Peterson did not live where the business was conducted, and it was not his duty to examine the books, as his relation throughout was that of a special partner.

Mr. Justice PAXSON delivered the opinion of the court, May 7th 1879.

The court below having entered a judgment of nonsuit against the plaintiffs upon the trial, we have but to consider the single question whether there was sufficient evidence to entitle the case to go to the jury.

The case of the plaintiffs as presented was this: On the seventh day of November 1866, the defendants, Edward W. Gould, Theodore R. Strong and Jesse White, Jr., of the city of New York, and Pearson S. Peterson, of the city of Philadelphia, entered into articles of copartnership, under the name of Gould, Strong & Co., for the purpose of "buying and selling stocks on commission, making loans, collecting promissory notes, drafts and bills of exchange." The partnership was in the form of and was intended to be a limited partnership, the three gentlemen first named being the general partners, residing in New York, where the business was to be conducted, and the said Peterson being the special partner and contributing the sum of $20,000 as cash capital. The partnership was renewed annually to 1877 inclusive, but by an admitted informality in the renewals Peterson became a general partner at the end of the first year so far as the public are concerned, and continued so until its termination. As between the partners, it remained a

[Guillou *v.* Peterson.]

special partnership. The agreement further specified that the general partners should not engage in speculations of any kind; that Peterson, the special partner, should not in any event be liable for the debts or obligations of the firm beyond the amount of capital ($20,000) contributed by him, and that he should transact no business for the firm, nor be employed for that purpose as agent, attorney or otherwise. Mr. Peterson seldom visited New York, and appears to have taken little if any part in the business.

Theodore R. Strong, one of the partners, was one of the executors of Samuel L. Haven's will. Mr. Haven resided in New York and died in the autumn of 1865. The other executor, Thomas S. Shepherd, took but little charge of the estate; Mr. Strong was practically the acting executor. In the month of February 1867, Gould, Strong & Co. borrowed from Mr. Strong $28,000 of the United States treasury notes, known as seven-thirties, which he held as executor and which belonged to Samuel L. Haven's estate. These notes remained in the possession of the firm and were used by them for the purpose of raising money until June 1868, when, having been called in by the government, they were on the 19th of that month converted into other bonds known as five-twenties. Whether the conversion was by Strong or the firm is not clear. In Strong's account as executor with the firm he is credited on July 6th 1868, with $28,000 seven-thirties at 109, less commission, $31,453.80, and on the same day he is debited with $28,000 five-twenties, new at 108¾, $30,485. Within a few days thereafter $25,000 of these five-twenties were entered on the blotters and ledger of the firm as loans from Strong. They were used for the business of the firm, as stated by Mr. Strong, " to pay for stocks that we were carrying—stocks for our customers;" and again, " these stocks and bonds were used, during the years they were held by Gould, Strong & Co., as collaterals to raise money. This money was used in our business." The five-twenties thus loaned to the firm and thus used by them, were never returned to Strong, but were sold to Jay Cooke & Co. by Mr. Gould, on Dec. 14th 1871, for $28,437.50, and the proceeds used to pay a loan for which they had been pledged by Gould, Strong & Co. For the like purpose of raising money the firm borrowed from Strong, in 1869, 513 shares of the stock of the Pittsburgh, Fort Wayne and Chicago Railway Company, belonging to the said estate, which said stock was continuously used as collateral to raise money until January 8th 1872, when the firm borrowed the sum of $45,000 from the City Bank upon these 513 shares of stock. The bank was repaid about January 22d of the same year $45,314.09 by the sale of 471 shares of said stock, and the balance thereof, forty-two shares were delivered to Mr. Shepherd, the other executor, who appears to have then learned for the first time of Mr. Strong's *misapplication* of the securities belonging to Mr. Haven's estate.

[Guillou v. Peterson.]

Gould and White were cognisant of all these transactions, and were active participants therein. There was evidence, and for the purposes of this case it must be taken as true, that Mr. Peterson knew of the transaction of the seven-thirties. Strong says: "He (Peterson) knew of the loan of the treasury notes. *He knew they belonged to me as executor.* He got that information from either Mr. Gould or myself; we were both present. I don't know which of us told him. That was in April 1868."

No question has been made, indeed none could be made, as to the liability of Strong, Gould and White to Mr. Haven's estate upon this state of facts. Strong, the executor, was guilty of a fraud upon said estate, and Gould and White were participants therein. It was a *misapplication* of the assets of the estate, to use the polite and considerate term in general use to express a breach of trust. In the language of the law and of common honesty, it was an *embezzlement.* It was not the case of a loan of unemployed funds by an executor to his firm, for the purpose of gaining interest for his *cestuis que trustent,* but of the loan of interest-bearing securities to enable the firm to carry on its operations. Such breaches of trust have become so frequent and so startling within the last few years, that we would fail in our duty were we to omit to mark them, when they come before us, with the seal of our stern condemnation.

It remains to consider the question of Mr. Peterson's liability. The right of the plaintiff to waive the tort and sue in assumpsit for money had and received is too well settled to need either argument or the citation of authority. It is alleged, however, that Mr. Peterson is not liable, for the reason, among others, that "by the terms of the partnership articles he was to be liable only to the extent of the capital he had contributed, and the terms of those articles were known to the executor of Haven's will when the securities were delivered for use." This position concedes Peterson's liability to the extent of $20,000. It assumes, however, that the estate of Mr. Haven is in no better position than Strong, the executor, would be. Is this position sound? I concede that if Strong had advanced his own money or his own securities to the firm, he would be bound by the limitation in the agreement between the partners. But this suit is not by Strong or for his benefit. The securities he loaned the firm were not his property. They belonged to Mr. Haven's estate. In the ordinary legitimate dealings of an executor with the assets of an estate, the parties in interest are bound by his acts and perhaps affected with notice. In such case he may, in a qualified sense, be regarded as their agent. But surely this principle cannot apply where an executor is acting in fraud of the rights of the estate. It is opposed to every well-settled principle applicable to trust funds. Trust property squandered by a faithless trustee can be followed wherever found, and if earmarked equity will lay its strong hand upon it and restore it to its rightful

[Guillou *v.* Peterson.]

owner. Such owner is not bound by what his trustee has done or omitted to do; and may repudiate or rescind his contracts, saving of course the rights of innocent third parties. Mr. Strong was not acting for his *cestuis que trustent* when he loaned these securities to his firm; he was acting in direct antagonism to them; he was embezzling their securities; he was doing that which was a sufficient cause for his removal by the court having jurisdiction of his accounts. We think that the owners of the securities loaned by the executor to his firm occupy a very different position from the executor himself, and that they are not to be affected with his knowledge of the private understanding or agreement between the partners. That the acts of a trustee in excess of his powers are not binding upon his *cestui que trust* was decided in Bohlen's Estate, 25 P. F. Smith 304. Much more so where the act is not a mere excess of power but a clear and fraudulent abuse of it.

It is said, however, that Mr. Peterson is not liable for the further reason that the power of one partner to bind the others is at most an implied power; that each partner is the agent of his copartners only when acting in the scope of his power, and in the usual course of the business of the firm, and that when his agency is denied or forbidden by his co-partner, with notice to the party assuming to deal with him, as the agent of the firm, his act is not that of the firm, but his individual act only. As an abstract proposition this is correct: Story on Partnership, sections 123 and 138, and note 1, p. 218; Parsons on Partnership 95; Gallway *v.* Matthew, 10 East 264; Spooner *v.* Thompson, 48 Vt. 259; Feigley *v.* Sponeberger, 5 W. & S. 564; Yeager *v.* Wallace, 7 P. F. Smith 365. It does not apply to this case as it stood before the jury when the judgment of nonsuit was entered. The cause has been argued upon the theory that the securities were borrowed for the purpose of using the money in wild speculations prohibited by the agreement of partnership. The evidence is not so. The money was used in the business of the firm, carrying stocks for their customers, &c. It was true the failure of the firm was caused by speculations in stocks in 1872, but there is no evidence that they were engaged in such speculations at the time the securities were borrowed, or that the securities were used for any such purpose. The borrowing of securities may be regarded as the equivalent of borrowing money so far as the responsibility of the firm is concerned. This has always been considered as among the implied powers of a partnership, and when exercised by a partner in the name of the firm, for the business of the firm, and the proceeds so applied, it has always been held to bind the firm unless actual notice can be traced to the person loaning the money that the partner had no authority for such purpose.

Our own books are meagre in authority upon the question of the responsibility of a firm under such circumstances. It has been

[Guillou v. Peterson.]

largely discussed in England, however, in a series of cases growing out of the forgeries of one Fauntleroy, who was convicted and executed for his offence. Marsh v. Keating, 2 Cl. & Fin. 250, is the leading one of those cases. There the stock, the proceeds of which went into the firm, was sold upon a forged power of attorney. The firm of Marsh & Co. had certain certificates of stock belonging to Keating, one of their customers; Fauntleroy, a partner in the banking house of Marsh & Co., forged a power of attorney and caused the stock to be sold. The receipt of the proceeds of the sale of the stock was not entered in any of the ordinary books of the defendant's firm, nor did the sum ever come into the yearly balances of the firm. It was entered only to the credit of the bank, in a pass-book kept between them and their agents, Martin & Co., and it was the duty of Fauntleroy, as between himself and copartners, to have entered the said sum in the books of Marsh & Co., if he intended it for their account. Fauntleroy also continued to make regular entries of credit to Keating for dividends collected on the stock, as if these dividends had been regularly received from time to time. The partners of Fauntleroy were ignorant of the fraud, but the court said they might with common diligence have known it, and held them responsible, though in point of fact the money had not been received by them, but was embezzled by Fauntleroy. Stone v. Marsh, 6 B. & C. 551, was another case growing out of the same series of forgeries. Here Fauntleroy was one of the trustees of the stock sold, as well as a partner in the house of Marsh & Co. He executed a power of attorney to transfer the stock, and forged the names of his co-trustees. The stock was sold under this forged power and the proceeds received by Marsh & Co. in the same manner as has been described in Marsh and Keating. Lord Tenterden, C. J., held that it was the duty of the banking house to place the money to the credit of the trustees, and that no ignorance on the part of any of them, nor any neglect on the part of the house arising from a misplaced confidence reposed by them in one of themselves, to which the plaintiffs were no parties, can deprive the plaintiffs of their money. In Sadler v. Lee, 6 Beavan 324, the facts were similar except that there was no forgery. The stock was clandestinely sold upon a genuine power of attorney by one of the partners, and a credit given to the firm for the proceeds. The sale was concealed from the other partners, and the dividends accounted for as if actually received. The plaintiffs' trustees were not regular customers of the firm, but Lord Langdale held that the difference was immaterial. The partners were held liable, on the ground that the bankers received the proceeds of the sale. It was attempted to distinguish these cases from the one in hand by the fact that in each of them the stocks were received by the firm in the regular course of business. I am unable to see the distinction.

[*Guillou v.* Peterson.]

The wrong done here on the part of the firm was in converting the securities. It is manifest they had the custody of them for Strong, and collected the interest and dividends for him. The account shows this. Afterwards they borrowed the securities from Strong. This did not authorize their conversion. It imposed an obligation to return them in specie. If sold it was the duty of the firm to have carried the proceeds to Strong's credit as executor. Instead of doing so Gould sold the five-twenties and with the proceeds paid a debt of the firm, while the railway stock went to pay the $45,000 due to the bank. For both these debts Mr. Peterson as a general partner was individually liable. It is entirely in the course of the regular business of the firm to pay its own debts. I regard the case in hand as stronger than those cited, for the reason that the firm got the benefit of every dollar realized from the securities, while in Marsh *v.* Keating and Stone *v.* Marsh, Fauntleroy cheated his firm as well as the owner of the stock, by appropriating to his own use the money received from the sale of said stock.

It is not meant to advance the broad proposition, that where one abuses his trust, and thereby obtains the means to advance money to a partnership, he thereby raises a contract between the partnership and the person whose money has been so used. The rule is thus laid down in Lindley on Partnership, at page 327: "If a partner, being a trustee, improperly employs the money of his *cestui que trust* in the partnership business, or in payment of the partnership debts, this alone is not sufficient to entitle the *cestui que trust* to obtain repayment of his money from the firm." To the same point are Ex parte Heaton, Buck 386; Ex parte Apsey, 3 Bro. Ch. C. 265; Jacques *v.* Marquand, 6 Cowen 497. If Mr. Strong had sold the securities belonging to Haven's estate, and placed the proceeds in the firm as his share of the capital, or had loaned it to the firm as his own money, and without knowledge on their part that it was trust money, they would not have been liable to an action by the representatives of Haven's estate. Here the securities belonging to the estate were sold by the firm, with knowledge of the true ownership, and the proceeds used to pay its debts. This, under the authorities, treating Mr. Peterson as a general partner, which we think he is, would make him liable without notice or knowledge on his part of the borrowing of the securities or their conversion by his partners.

But even if we treat Mr. Peterson as a special partner, so far as Haven's estate is concerned, this judgment must be reversed. As before observed, the right to recover against the general partners is undoubted. It is equally clear as to Mr. Peterson, if he had notice of these transactions, or might or ought to have known them. There was evidence that he did not know; not as to all, perhaps, or to the full extent of their operations. But he knew in April 1868 that his firm had borrowed $28,000 of the securities of the Haven

estate from the executor.    Then was the time for Mr. Peterson to speak.    Had he spoken then, as he should have done, Mr. Haven's estate might have been saved from ruin, his firm from its subsequent insolvency, and his own estate from the peril of this litigation.    A man who is brought face to face with such an irregularity as this on the part of his firm, cannot shut his eyes and refuse to see it. Whether we regard the transaction as a wrong to the estate, or a violation of the partnership agreement in regard to speculation, it was ample to put Mr. Peterson upon inquiry as to the nature of the transactions of his firm, and if he chose to sleep upon such a disclosure, he has no one to blame but himself.    It is no answer to this to say that the seven-thirties were returned, and that he had no subsequent notice.    It was for the jury to say whether the alleged return was anything more than a matter of book-keeping, and for any other purpose than that of exchanging the form of the securities.    In any event he had a right to examine the books, and after the irregularity referred to it was his duty to have done so.    Such examination would have disclosed the conversion of the securities belonging to the Haven estate, and the application of the proceeds to the payment of the debts of his firm.    He must now be charged with the knowledge he might and ought to have acquired.

We are of opinion that the case should have gone to the jury, and that it was error to enter a judgment of nonsuit.

The judgment is reversed and a *procedendo* awarded.