Alice S. HIGGINS, Plaintiff on Behalf of Herself and Other Stockholders of Shenango Pottery Company, Similarly Situated, Appellant,

Harry Barkby, Intervenor-Appellant,

v.

SHENANGO POTTERY COMPANY, a Corporation, and James M. Smith, Jr., George B. Zahniser, Charles W. Read, Daniel H. Treloar, Jr., Zeno J. Pfau, John B. McCarty and Alvah M. Shumaker, Individually and James M. Smith, Jr., George B. Zahniser, Charles W. Read, Daniel H. Treloar, Jr., Zeno J. Pfau, John B. McCarty and Alvah M. Shumaker, Trading as Castle Engineering Company, a Partnership, Lynne Anderson Warren and Peoples First National Bank and Trust Co., Executors of Estate of James M. Smith, Jr., Deceased.

No. 11896.

United States Court of Appeals

Third Circuit.

Argued March 3, 1958.

Decided May 29, 1958.

As Amended on Denial of Rehearing June 24, 1958.

Harold R. Schmidt, Pittsburgh, Pa. (John L. Laubach, Jr., Rose, Rose & Houston, Pittsburgh, Pa., Morris Berman, Hancock, Dorr, Ryan & Shove, Syracuse, N. Y., on the brief), for appellant.

Joseph R. Doherty, Pittsburgh, Pa., Lynne Anderson Warren, New York City (Joseph S. D. Christof, McCloskey, Best & Leslie, Pittsburgh, Pa., on the brief), for appellees.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The plaintiff and intervenor in this stockholders' derivative suit appeal from the district court dismissal of three defendants at the close of the plaintiff's evidence.

The basis of the action is the alleged diversion from the Shenango Pottery Company by Smith, Jr., its president,

Zahniser, vice president in charge of manufacturing, and Read, another vice president [1] (all three also being directors) of a government business opportunity, the making of non-metallic land mines, to the defendant partnership, Castle Engineering Company, formed for the purpose of obtaining the particular government business. Recovery for Shenango of Castle's net profits from the operation plus incidental damages is sought.

The matter arose during the second world war. At that time over half the Shenango stock was owned by Smith, Jr., Zahniser, Read, and their families. The corporation was making hotelware and dinnerware. It was the world's largest manufacturer of vitrified china. From May 15, 1931 to February 4, 1949 there were no stockholders meetings of Shenango and minority stockholders were refused financial information of company affairs.

In 1942 the United States Army started a non-metallic, non-magnetic antitank land mine project. Shenango's chief competitor, Onondago Pottery Company and other concerns were given research and development contracts in this connection. Onondago was in production of the mine by late 1943 or the first part of 1944. It manufactured the ceramic parts, purchased the other parts and itself put these together, completing the mines. Around that time Shenango was asked by the Pittsburgh Ordnance District if it was interested in producing similar mines. It was sent the mine plans and advised it would be given complete information concerning them. The mines were being developed and produced by the various contractors as war projects with all knowledge as to the mines made available to any other manufacturers so engaged.

It can be readily inferred from the evidence on behalf of the plaintiff that Smith, Jr. learned of the Ordnance approach to Shenango and both he and defendant, Treloar, began efforts to ob-

tain the business for the concern which later became Castle Engineering Company. Smith, Jr., Zahniser and Love, another officer and director of Shenango, on February 5, 1944 inspected Onondago's mine project, decided Shenango should not be interested and so reported to the other directors who did not object. There was no report to the stockholders. Within ten days after the inspection Castle submitted a bid for the business which contemplated a profit of $73,000. The request for that bid had actually come to Shenango. Castle's address was given as care of Shenango and Smith, Jr. was named as its negotiator. Castle then was not organized, had no facilities, assets or plant. Shenango was listed as its ceramic parts supplier. The ceramic element of the mine was its most expensive item and was a new and difficult production for Shenango. It is indicated that elaborate negotiations with suppliers of the other necessary parts were conducted by Smith, Jr. and Treloar in the name of Shenango. In February, 1944, Castle was incorporated with Smith, Jr., Treloar, Pfau, Zahniser, Shumaker and John W. McIlwraith, listed as directors. An affidavit stating that $5,000 capital had been paid in, was filed. The money was not so paid and the corporation was abandoned the following month.

The Castle bid was rejected February 21, 1944, either because Castle was not yet in existence or because its credit was not satisfactory to the government. Thereupon, at Smith's request Shenango on the same day bid for 100,000 land mines, Shenango to take the contract and Castle to execute it with Shenango to supply the ceramic parts. Shenango because of its reputation and ability was given a non-assignable contract for the work. Thereafter Castle in fact assembled the mines. All the fuse adaptors used for the mines of the first contract and a number of those under the second were bought and paid for by Shenango and billed later to Castle. This procedure was followed as to a great

---

1. This defendant was eliminated from the suit by stipulation.

number of other parts used in both contracts.

In March 1944, $22,950 of the $50,000 cash capital was paid into the partnership and the Certificate of Limited Partnership signed. The latter was not filed until the following October. There is evidence that the Castle partners had been concerned with the land mine business since January 1944, that they knew the government proposition had been first given Shenango, that the all-important ceramic parts were to come from Shenango and that they were all advised of the progress of the land mine enterprise.

Castle assembled the mines with unskilled labor in an old leased skating rink. Its equipment consisted of a conveyor, work tables and two machines. The cost of the first contract machinery and equipment was $13,027.23. Shenango had originally furnished $3,926.83 of this. The production line was developed by Smith, Jr. He and Treloar took care of all executive and management duties. Information and help was received by Castle from other contractors doing the same sort of work.

The total cash capital paid into Castle by April 8, 1944 was $32,500. It had been estimated that $150,000 would be necessary to run the business. Smith, Jr., Treloar, Pfau and McCarty gave notes totalling $17,800 which they owed Castle for the balance of their partnership contributions and which they did not pay until August 18, 1944. From the beginning in March 1944 throughout the Castle operation Shenango furnished labor materials of all kinds, assembly operation parts, and the ceramic portions of the mines. Payment for these was not made until Castle had in effect been paid for the mines. On one occasion Castle's indebtedness to Shenango was $160,187.65. Usually Shenango paid Castle for the mines prior to receiving payment itself from the Government and without offsetting the large sums it was owed by Castle. On occasion Shenango had advanced funds to Castle covering checks issued by the latter. And Shenango on Castle's behalf paid for various materials unconnected with land mines.

Castle earned $148,541.13 on its first contract. It bid for 123,000 more mines and this was accepted at Shenango's request and because Castle had assembled the first group of mines under Shenango's contract. A third contract for 15,000 mines was also given Castle. The second agreement was stopped in October 1944, prior to completion. The third was terminated before any production had started. Castle's remaining profit from the mines amounted to $168,062.58 making a total of $316,603.71 for about nine months work and on an original investment of $32,200.

Plaintiff on July 20, 1948 demanded that the Shenango Board of Directors take action against Smith, Jr. and the other then unknown officers and directors involved in the diversion of the land mine business. No action being taken, plaintiff insisted on a stockholders meeting. That was held February 4 and 5, 1949. Plaintiff's resolutions for said action and for compliance with Pennsylvania law were voted down by the Smith, Jr., Zahniser, Read majority block. Smith, Jr. died subsequent to the start of this suit and his personal representatives have been substituted. After plaintiff and intervenor had rested subject to their right to introduce certain testimony and records, Shenango, Smith, Jr.'s estate, and Zahniser, who are all represented by the same counsel in this proceeding, unsuccessfully moved for a dismissal as to all of said parties. Additional motions for dismissal of defendants Pfau, Shumaker and McCarty were allowed, from which rulings this appeal is taken. These three defendants were purportedly limited partners in Castle but had no connection with Shenango.

■■ Pennsylvania law governs the issues. Under it the Shenango directors and officers occupied a fiduciary relationship toward the company stockholders.[2]

They were bound to act in the utmost good faith. They could not deal with the funds and property of Shenango nor utilize the influence and advantage of their offices for any but the common good. If they made a personal profit through the use of Shenango's assets they were accountable for it to the stockholders; they were not permitted even to place themselves in a position which invited conflict between their self-interest and their integrity.[3]

Plaintiff's above detailed evidence clearly points to a conflict between the Shenango officer and director defendants' obligation to their company and their self-interest. That evidence indicates those defendants used most every element of Shenango but the hotelware product itself for their own selfish interest. And as the Bailey decision, 325 Pa. at page 194, 189 A. at page 324, states: "It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment."

It should be borne in mind that all the defendants were served both individually and as partners in Castle Engineering Company. The claim for relief sounds in equity and seeks an accounting and restitution of monies, the receipt and retention of which by the defendants constitute unjust enrichment to them. The case therefore does not involve an attempt to impose on the three defendants with whom this appeal is concerned vicarious liability for the wrongs committed by their co-partners acting individually, but seeks to impress them with a constructive trust for the return of what is not rightfully theirs. Nor is it vital for plaintiff to prove that some breach of duty has been committed by these particular defendants. It is enough that the evidence on her behalf is that the partnership improperly received benefits; suit subsequently against the members makes each one served with process jointly and severally liable for any judgment entered. The liability asserted against these three defendants can stem only from their capacity as partners, though if judgment were to be entered on that basis each would become individually liable for the whole judgment in the absence of any limitation on their individual liability. Thus once there is an admission or evidence that an individual is a partner, he is thereafter entitled to a dismissal only on a finding that the partnership itself cannot be liable to the plaintiff. Since the orders of the district court do not set out the reasons motivating the dismissal, the only inference from the foregoing analysis is that the court found no liability made out against the partnership and therefore dismissed as to those defendants who could be liable only in their partnership capacity. Dismissal as to the other defendants must therefore have been denied because, though not liable in their capacity as partners, they could be held liable in their fiduciary capacities.

Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S.C. is not relevant to this appeal. By its terms its application is to "multiple claims." As pointed out in Sears, Roebuck & Co. v. Mackey, 1956, 351 U.S. 427, 435, 76 S.Ct. 895, 899, 100 L.Ed. 1297: "The amended rule does not apply to a single claim." We are dealing here with a single claim made against a number of defendants individually and against the same defendants plus the three appellees jointly. That this is indeed a single claim is demonstrable by the fact that a judgment could be entered only once against the fiduciary defendants, whether in their partnership or individual capacities. There could be no double recovery—one on each of the two capacities.

Our analysis has already indicated that when the case against the three individual defendants, who could be liable only because they were partners with the others, was dismissed there was

---

**3.** See, e.g., Lutherland, Inc. v. Dahlen, 1947, 357 Pa. 143, 53 A.2d 143; Bailey v. Jacobs, 1937, 325 Pa. 187, 194, 189 A. 320.

only one inference: none of the defendants could be individually liable by reason of his being a partner. But some of the defendants might nonetheless be individually liable on the same claim for their actions done outside their capacity as partners. The case is thus a different one from that presented by Hohorst v. Hamburg-American Packet Co., 1893, 148 U.S. 262, 13 S.Ct. 590, 37 L.Ed. 443, which held that where multiple parties were charged solely with joint liability, a judgment was not final unless it terminated the action as to all parties. " * * * (T)here is no doctrine that finality is lacking in an order simply and solely because it dismisses less than all the parties. Where 'jointness', in some form, is absent, the test in multiple party cases is whether the order terminates the suit 'as a severable matter' or a 'distinct matter,' with respect to the party dismissed. [Citing cases.]" Republic of China v. American Express Co., Inc., 2 Cir., 1951, 190 F.2d 334, 335. The order of dismissal was a final order and this court therefore has jurisdiction of this appeal. 28 U.S.C. § 1291. See 6 Moore's Federal Practice (2d ed. 1953), para. 54.19.

Because the dismissals were granted under Rule 41(b), F.R.C.P., the question for review is whether on the evidence presented the law would impute liability to the partnership, when some of the partners are individually fiduciaries of the corporation with which the partnership has close connections and dealings, for profits realized as a consequence of any breach of trust to the corporation by the partners who individually are fiduciaries.

The Uniform Partnership Act, 59 Pa. Stats. Anno. § 34 provides:

"Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, *operate as notice to or knowledge of the partnership,* except in the case of fraud on the partnership committed by or with the consent of that partner." (Emphasis supplied.)

The section is a codification of the Pennsylvania common law of partnership.[4] The law of partnership is very largely a branch of the law of agency. "Every partner * * * is not only a principal, but is also, for all purposes within the scope and objects of the partnership, a general and authorized agent of the firm, and the agent of all the partners." 40 Am.Jur. § 136. And it is a rule of agency that the knowledge of the agent is imputed to the principal in connection with any transaction conducted by the agent in behalf of his principal. Restatement, Agency § 272. In Pennsylvania this rule is limited to " * * * knowledge acquired in the course of the business in which the agent was employed." Houseman v. Girard Mutual Building & Loan Ass'n, 1876, 81 Pa. 256, 262; Penna. Anno. to Rest. of Agency, § 272. Whether this limitation would be imparted to the quoted section of the Uniform Partnership Act (though from the wording thereof this is unlikely) is of no moment to this case, since the plaintiff's evidence is that the knowledge of the breach came to the fiduciary partners at the time the breach was committed and when they were acting in the interest of the partnership. The rule which imposes civil liability upon an "innocent" partner for bad faith dealing of a co-partner is most pointedly applicable where the co-partner participates in the benefits derived from the dealing in bad faith. The partnership in such situation would be liable for any profits realized from a breach of their fiduciary duty by a number of the partners for the purpose of benefiting the

4. Adams v. Ashman, 1902, 203 Pa. 536, 53 A. 375; Thompson v. Christie, 1890, 138 Pa. 230, 20 A. 934, 11 L.R.A. 236; Stockdale v. Keyes, 1875, 79 Pa. 251; McClurkan v. Byers, 1874, 74 Pa. 405.

partnership at the expense of Shenango. Guillou v. Peterson, 1879, 89 Pa. 163; cf. Treon v. Shipman, 1922, 275 Pa. 246, 119 A. 74; Baxter v. Wunder, 1926, 89 Pa.Super. 585.

■ It has been suggested that 59 P.S. §§ 171 and 191 [5] require a different conclusion. Though there seem to be no Pennsylvania cases on the point, it is clear that these sections would not control this case. The limitations on liability have no relevancy to a limited partner's being held to answer for profits realized on his contribution to the capital of the partnership. The sections referred to would operate in this instance only if an attempt were made to collect the whole judgment against the partnership from one of the alleged limited partners; in such a case that partner could not be held for more than the amount of his own profits plus his contribution to the partnership funds. We need not, therefore, decide whether in fact Castle Engineering was a limited partnership, though there are serious doubts that there was adequate compliance with the statutory conditions. The implications to be drawn from 59 P.S. § 195 [6] lend support to our interpretation of the Act.

The result we have reached would be the same accomplished without resort to agency principles or the Uniform Partnership Act but by applying the pertinent rules of the law of restitution and of constructive trusts. Where a fiduciary in violation of his duty to the beneficiary causes property to be transferred to another, the other holds the property upon a constructive trust if he gave no value or if he had notice of the violation of duty. Restatement of Restitution § 201. Accord, Kern v. Smith, 1927, 290 Pa. 566, 139 A. 450; In re Sheaffer's Estate, 1911, 230 Pa. 426, 79 A. 651. Cf. 3 Scott on Trusts, § 469.

■ The evidence for the plaintiff is to the effect that Pfau, McCarty and Shumaker knew that Smith, Jr., Zahniser and Read were officers and directors of Shenango; that knowing this they went into the Castle operation with them. There is enough in the proofs from which it may be inferred that they knew or should have known that the Castle scheme was contrary to the best interests of Shenango; that every circumstance relating to the transaction was so extraordinary that these men, partners in Castle, could not stand by and avoid even a simple inquiry; that dealing as they were with these Shenango fiduciaries, knowing who they were and, therefore, what they were, Pfau, McCarty and Shumaker were bound to ascertain whether their partners were violating their trust; that because they were chargeable with knowledge of the breach, or at least with the compelling duty of inquiry, they must make restitution for the benefits they have realized as a consequence of the breach of trust. Heilig Bros. Co., Inc., v. Kohler, 1950, 366 Pa. 72, 76 A.2d 613; In re Noonan Estate, 1949, 361 Pa. 26, 63 A. 2d 80; cf. First Nat. Bank of Biddeford v. Pittsburgh, F. W. & C. R., D.C.E.D.Pa. 1939, 31 F.Supp. 381.

Three minor points remain. With respect to the exclusion of the testimony of the witness Swift and of Exhibits 297,

5. 59 P.S. § 171: "A limited partnership is a partnership formed by two or more persons under the provisions of section two, having as members one or more general partners and one or more limited partners. The limited partners as such shall not be bound by the obligations of the partnership."

59 P.S. § 191: "A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business."

6. 59 P.S. § 195. "A person who has contributed to the capital of a business conducted by a person or partnership, erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership; provided, that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income."

298 and 299, we are inclined to the view that the basis of the rulings was predominantly factual and within the discretion of the trial court.

 Laches is not an element in the pending litigation. Shenango's right to recover at law was governed by the Pennsylvania six year statute of limitations. 12 P.S. § 41. The action before us was commenced well within that period.

Under the facts and law plaintiff has shown a prima facie right to relief against these appellees. It follows that her action against them should not have been dismissed under Rule 41(b) at the conclusion of the presentation of evidence on her behalf. The judgment of the district court will be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

The petition for rehearing is hereby denied.

Costs will abide final judgment.