In re Wilton B. JACKSON, Janet G. Jackson, t/a Greenbank Farm, A Partnership, Debtors.

In re Wilton B. JACKSON and Janet G. Jackson, Individually as partners in Greenbank Farm, Debtors.

In re Walter B. JACKSON and Carol E. Jackson, husband and wife, individually, and Walter B. Jackson, as a partner in Greenbank Farm, Debtors.

James R. LEONARD, Jr., Trustee

v.

Henry WESSEL and Alan S. Carpel, Individually and t/d/b/a Wessel and Carpel, a Partnership.

Bankruptcy Nos. 81–00396, 81–04010 and 81–04615.

Civ. A. No. 88–8303.

United States District Court, E.D. Pennsylvania.

Aug. 15, 1990.

On Motion for Reconsideration Sept. 27, 1990.

Frederick P. Kramer, William J. Gallagher, West Chester, Pa., for appellees.

Duane, Morris & Heckscher by Reeder R. Fox, Philadelphia, Pa., for appellants.

Henry Wessel, pro se.

LOUIS H. POLLAK, District Judge.*

Friends, I thank you for your patience in the long gestation of this matter. I also thank you for coming in this morning. It's my intention this morning to rule on the matters that have been waiting decision.

What is at issue is a decision of Judge Scholl's in September of 1988, at which he made three rulings with respect to an adversary proceeding which had been instituted by the trustee in three consolidated Chapter 7 cases. Judge Scholl concluded that the adversary proceeding was a core proceeding within the meaning of 28 U.S.C. Section 157(b). Judge Scholl ruled that the trustee had not waived his entitlement to

---

* This bench opinion has been slightly edited with a view to improving intelligibility.

ask for a jury. And, finally, Judge Scholl ruled that the jury trial, which he concluded was appropriate, was a trial which could be had in the bankruptcy court.

Review of Judge Scholl's decision was held in abeyance pending the Supreme Court's review and disposition of the case called *Granfinanciera.* That case was ultimately decided in June of last year, and is reported at — U.S. —, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

Subsequent to that decision, the parties have made supplementary submissions here prior to and following argument. At last, the issues are to be addressed and determined.

This case has its roots in a Chapter 11 proceeding filed on February 4th, 1981. That was a partnership filing.

In August of 1981, counsel for the debtor was replaced. Subsequently, new counsel converted the Chapter 11 proceeding into a Chapter 7 proceeding. An additional Chapter 7 proceeding was filed on behalf of those who had been originally denominated members of the partnership, Wilton B. Jackson and Janet G. Jackson; the partnership being Greenbank Farm. The additional Chapter 7 proceeding was brought on behalf of Wilton B. Jackson and Janet G. Jackson, individually and as partners in Greenbank Farm.

A further Chapter 7 proceeding was also filed on behalf of Walter B. Jackson and Carol Jackson, individually. Walter B. Jackson is a partner in Greenbank Farm.

The adversary proceeding, which is the focus of concern here, was initiated in September of 1982. That adversary proceeding was one brought against the law firm and its members, which had represented the original Chapter 11 partnership and its members—that is to say Wilton Jackson and Janet Jackson, and also, as alleged, Walter Jackson.

The adversary proceeding asserted three causes of action against the defendant attorneys. One sounded in contract and alleged a breach of a contract to perform expert legal services during the period running from January of 1981, some two weeks before the Chapter 11 filing, to August of 1981, when counsel were replaced.

The second count alleged negligent performance of the obligation incumbent on attorneys to perform competent legal services. And, again, the count covers the January to August time period.

The third count is characterized as one alleging gross negligence and breach of fiduciary duty and abuse of process. And that count, which covers essentially the same ground as the first two counts, focuses particularly on allegations of failures by the defendants to live up to their obligations to the bankruptcy court and to creditors, as well as to the debtor and its constituent members and Walter Jackson, in violation of the duties imposed on officers of the bankruptcy court by the Bankruptcy Code.

Now, the crux of the allegations of the complaint, which are said to support these three counts, has been summarized by Judge Scholl in the following language:

"The complaint in less than totally lucid fashion, alleges that the defendants acted wrongfully in at least six different senses.

(1) Advising the debtors to file bankruptcy at all, in light of the fact that they allegedly had sufficient assets to cure the defaults which had resulted in the sheriff's sale that had precipitated the bankruptcy filing;

(2) Filing the case as a partnership bankruptcy, but listing the partners' individual assets and/or commingling them with partnership assets on the debtor's schedules;

(3) Advising the debtors that they could recover certain post-petition expenditures as administrative expenses without filing requisite motions to assure this, which resulted in their loss of an opportunity to recover the funds expended for those purposes.

(4) Giving erroneous tax advice regarding the treatment of salary paid to Walter B. Jackson;

(5) Intentionally failing to disclose fees paid to them by the debtors or to disclose the repayment of a loan made by the debtors to finance such fees; and

(6) Negotiating a liquidating plan for the debtors which they did not approve or desire." 90 B.R. 126 (1988).

That is on page three of Judge Scholl's opinion.

The adversary proceeding was stayed in October of 1982 to take account of the decision in the Marathon case. That is, of course, *Northern Pipeline Construction Company v. Marathon Pipeline Company*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). That case, which will be discussed in a moment or two, called for, in effect, the restructuring of the bankruptcy courts. It took until 1984 for the Congress to respond legislatively. The stay in this adversary proceeding remained in force, however, until 1988. A variety of factors appeared to contribute to this long delay. These need not be detailed here. But, essentially, among the things that happened were changes of trustees, changes of counsel for the trustees, and ultimately a transfer of the case from Chief Judge Twardowski to Judge Scholl pursuant to a petition to Judge Twardowski to recuse himself.

It is to be noted that the transfer related merely to this adversary proceeding, not to the underlying bankruptcy proceedings. It was after Judge Scholl took over the case that the stay was lifted, that a demand was made by the trustee for a jury trial of this matter—a demand that was resisted by the defendants—and that in due course, in the ruling which I have summarized of Judge Scholl's in September of 1988, Judge Scholl sustained the demand for a jury, finding that it had not been waived and that it was implementable in the bankruptcy court.

I have referred to *Marathon* as a decision in 1982, which created a pause of a substantial nature in this proceeding and in bankruptcy proceedings across the country.

What happened in *Marathon?* Well, in *Marathon*, the Supreme Court determined that the bankruptcy court, as constituted by Congress in its bankruptcy reform legislation of 1978, was, at least with respect to some proceedings, structured in a fashion that was inconsistent with the mandate of Article III—that the judicial power of the United States should be administered by

Article III courts. The bankruptcy courts were not, and they are not today, Article III courts. That is to say, they are not staffed by judges appointed for good behavior and whose salaries are constitutionally protected against diminution while in office.

The determination of the Supreme Court in *Marathon* was that the claim made by Northern against Marathon was an ordinary contract claim defined by state law, which, if it were to come into the federal courts, as it was to, via the bankruptcy power, would have to be determined by an Article III court.

Now, the conclusion is easier to state than the rationale because there was no majority opinion in *Marathon*. There was a plurality opinion by Justice Brennan on behalf of himself and three colleagues. There was a concurring opinion by Justice Rehnquist for himself and one colleague, Justice O'Connor, and Chief Justice Burger, Justice White and Justice Powell were in dissent. Dissenting opinions were filed both by the Chief Justice and by Justice White.

Justice Brennan's plurality opinion announced that there were only three categories of situations in which it was compatible with the mandate of Article III that non-Article III tribunals administer federal justice. Those three categories covered, one, the creation of courts to sit in the Territories and the District of Columbia: Historically those areas over which the United States flag flies that have not been organized into states have been staffed by United States courts whose judges are not Article III judges, in the sense that they had not had the protections of tenure and salary which are the hallmark of Article III courts.

The second category of federal justice exempted from Article III's requirements is the category of courts-martials administering military justice.

The third category, less clearly defined, is that of disputes involving "public rights." Justice Brennan drew from the cases the conclusion that there is an area

of "public rights"—an area involving rights created by, or closely appurtenant to, the functions of the United States, which can, in Congress' discretion, be dealt with by entities which may be administrative agencies, or may be court-like tribunals which are not structured as Article III courts are.

Justice Brennan, for the plurality, rejected the contention that the bankruptcy power vested in Congress was cognate with the three categories which he had identified as exceptions to Article III. Justice Brennan concluded that there had been no demonstration that the implementation of the bankruptcy power warranted "such exceptional grant of power"—at page 71 of 458 U.S., at page 2871–72 of 102 S.Ct.—as would warrant exemption from Article III.

In addition, Justice Brennan said that to accept the argument made would seem to yield no limiting principle as to what categories of Article I business Congress could not vest in non-Article III tribunals, thus threatening ultimately the erosion of Article III, except as to the irreducible minimum of the United States Supreme Court itself, a tribunal which, and the original jurisdiction of which, are mandated by the Constitution.

To be sure, Justice Brennan did acknowledge that there might be an area of the bankruptcy power which would be responsive to the category of public rights, which was the third of the three categories of exemption from Article III referred to by Justice Brennan.

Justice Brennan said at page 71, 102 S.Ct. at page 2871–72, "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a 'public right,' but the latter obviously is not. Appellant Northern's right to recover contract damages to augment its estate is 'one of private right, that is, of the liability of one individual to another under the law as defined.' *Crowell v. Benson*, 285 U.S. [22] at 51 [52 S.Ct. 285, 292, 76 L.Ed. 598 (1932) ]."

The concurring Justices, Justices Rehnquist and O'Connor, joined in the judgment of the Court, but not in the Court's opinion. Justice Rehnquist's concurring opinion suggests a narrower focus. Justice Rehnquist and Justice O'Connor concentrated their attention on the fact that "the lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law. No method of adjudication is hinted, other than the traditional common-law mode of judge and jury. The lawsuit is before the Bankruptcy Court only because the plaintiff has previously filed a petition for reorganization in that court." 458 U.S. at 90, 102 S.Ct. at 2881.

Although, as we shall see, the judgment in *Marathon* created a revolution in the bankruptcy process in the United States, the Supreme Court has understood its own holding in *Marathon* as being the narrower statement made by the concurring Justices, as opposed to the rather broader and less precisely defined propositions announced by the plurality.

Thus, in *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the Court, through Justice O'Connor, said, speaking of *Marathon*, "The Court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants and subject only to ordinary appellate review." 473 U.S. at 584, 105 S.Ct. at 3334. In support of that statement, Justice O'Connor then cites to page 84 of 458 U.S., page 2878 of 102 S.Ct., which is Justice Brennan's opinion, and pages 90 to 92 of 458 U.S., pages 2881 to 2882 of 102 S.Ct., which is Justice Rehnquist's concurring

opinion, and page 92 of 458 U.S., page 2882 of 102 S.Ct., Chief Justice Burger's dissent.

Congress might have met *Marathon* head-on by converting the bankruptcy courts into Article III courts. Indeed, that was strongly proposed. At the last moment, Congress decided not to do that.

What Congress did do was to divide adversary proceedings into so-called core and non-core proceedings. The term "core" presumably was responsive to the word "core," as it appeared in Justice Brennan's opinion in language that I have read from page 71, page 2871–72 of 102 S.Ct.—"the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power."

Congressman Kastenmeier, in describing core cases, called them cases which would be "integral to the core bankruptcy function of restructuring debtor-creditor rights." Congressman Kastenmeier's language to that effect, together with other significant references to the legislative history of the 1984 legislation, are described in Judge Breyer's very valuable opinion in *In re Arnold Print Works*, 815 F.2d 165 (1987), in the First Circuit, in 1987.

It was the congressional expectation that in the neighborhood of 95 percent of adversary proceedings would turn out to be core proceedings. Non-core proceedings were referred to as *"Marathon*-type" proceedings.

The functional difference for administration of core and non-core proceedings was that the decision in a non-core proceeding would be reviewable *de novo* by the district court, whereas, a bankruptcy court's decision in a core proceeding would be dispositive and accorded the ordinary finality that a district court's decision would have subject, of course, to plenary review on matters of law, just as a district court's decision would be on review by a court of appeals.

By making so-called non-core proceedings, or, as some Congressmen refer to them, *"Marathon*-type" proceedings, reviewable *de novo,* it was evidently the congressional purpose to meet what was perceived of as the *Marathon* Court's difficulty with subjecting claims, which were entirely state law claims, and chronologically antecedent to the bankruptcy, to dispositive determination by a non-Article III court. To provide for *de novo* review was to protect the Article III function in the manner which the Court in *Marathon* had concluded—looking back to such authorities as *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285—Article III required.

Now, the precise definition of core proceedings is to be found at Section 157(b). Some of the relevant caption headings—there are numerous ones—are "matters concerning the administration of the estate"; "allowance or disallowance of claims against the estate or exemptions from property of the estate"; "counterclaims by the estate against persons filing claims against the estate"; "orders in respect to obtaining credit"; "orders to turn over property of the estate"; "proceedings to determine, avoid, or recover preferences"; "proceedings to determine, avoid, or recover fraudulent conveyances"; "objections to discharges"; "confirmations of plans", et cetera.

Section 157(b)(2) instructs at the start that "Core proceedings include, but are not limited to," the many specifically identified characterizations. Section 157(b)(3) instructs that "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."

▪ In this case under review, Judge Scholl concluded that the claim made by the plaintiff trustee involved "matters concerning the administration of the estate," within the meaning of Section 157(b)(2)(A).

First, I will address Judge Scholl's ruling that the claim in this case is a core claim. I have quoted Judge Scholl's summary, which is an apt one, of the allegations in the complaint.

As Judge Scholl explains, in terms of the events described in the complaint, the time period is largely located in the months following the filing of the Chapter 11 petition. As alleged, the relationship of lawyer and client commenced only on January 20 of

1981, two weeks before the February 4 filing.

It is further alleged that certain tax returns were submitted to the defendants on January 17th, but that is the earliest date alleged in the complaint as connecting the debtors and the defendants.

The allegations then cover the period running up to the beginning of August 1981, when the defendants withdrew as debtor's counsel.

The heavy center of gravity of the complaint, Judge Scholl concluded, is post-petition. That seems an apt characterization of the complaint. With that in view, Judge Scholl concluded that the complaint constituted a core claim. Instructive in his view was the decision which I've already referred of the First Circuit, *In re Arnold Print Works*, 815 F.2d 165.

What was then and remains the principal Third Circuit authority on the characterization of claims as core or non-core, namely *In re Meyertech Corp.*, 831 F.2d 410 (1987), Judge Scholl concluded was not inconsistent with characterization of the instant claim as a core claim. The claim involved in *Meyertech* was a creditor's claim rather than a debtor's claim. The Meyertech court concluded that the claim in Meyertech was indeed properly regarded as a core claim. To the extent, however, that its focus was on creditor rather than debtor claims, it is to that extent less pertinent to the instant case (though in no sense inconsistent with it) than *Arnold* is.

Suffice it to say, *Meyertech* seems to contemplate a broad approach to the characterization of core claims, which is, in my judgment, consistent with, and would tend to support, Judge Scholl's analysis. But, as I say, it is Judge Breyer's discussion in *Arnold* which seems to me strong authority for Judge Scholl's characterization.

I would only add a word to my view that Judge Scholl was correct in finding this to be a core claim. The fact that the third count of the complaint focuses, among other things, on allegations of professional conduct not compatible with obligations imposed by provisions of the bankruptcy law itself—provisions relating to the conduct of

practitioners before the bankruptcy court— that fact reinforces the view that this is a case that relates within the meaning of Section 157(b)(2)(A), to "the administration of estate." In addition, even the very small time period covered by the complaint which is pre-petition relates, of course, to the filing of the original Chapter 11 proceeding.

■ So I conclude that Judge Scholl was right in finding this to be a core proceeding. I also conclude that Judge Scholl was right in finding that there was no waiver by the plaintiff trustee of the jury claim. I will not rehearse Judge Scholl's description of the scenario. Suffice it to say that I conclude that Judge Scholl was entirely within his discretion to find that even though the precise timetable for the filing of a jury claim may—although there is ambiguity surrounding it, depending on what view one takes, of how long a stay was in force—have not been met, nonetheless, under Federal Rule 38, Judge Scholl surely had authority to entertain the jury claim.

In this connection, I would refer to *In re United Missouri Bank of Kansas City*, 901 F.2d 1449 at 1450 (1990), note five. In any event, it was not until the decision in *Granfinanciera*, which was some nine months after Judge Scholl decided this matter, that it was apparent that there is a constitutional entitlement to a jury with respect to the trial of a claim made in the bankruptcy process, which claim falls within the purview of the Seventh Amendment. Given that waivers of constitutional rights are not lightly to be entertained, there can be no effective imputation of waiver to the trustee in the summer of 1988 of a constitutional right whose clear delineation was not manifest until the *Granfinanciera* decision.

Accordingly, I would agree with Judge Scholl that there has been no waiver in this case. Now, that ruling carries with it by implication—and this was not explicitly addressed by Judge Scholl—a determination that the claim described in the trustee's complaint in this adversary proceeding is a

claim of a sort that would be covered by the Seventh Amendment. As to that, I don't think there can be any real doubt.

The claim, as described, is one that sounds both in contract and in tort. It characterizes, in a variety of ways, allegations of malpractice that are the common stuff of a jury claim. So coverage by the Seventh Amendment seems clear.

The remaining and dominant question is whether the jury entitlement is to be vindicated by trial in the bankruptcy court or a trial here in the district court. With respect to that issue, there were numerous cases prior to *Granfinanciera* that addressed the question of whether a bankruptcy court had authority to conduct a jury trial. There were many decisions under the 1984 legislation which now governs bankruptcy courts, and there were decisions under previous manifestations of the bankruptcy code.

The numerical bulk of the decisions prior to *Granfinanciera* affirmed an authority in the bankruptcy court to conduct jury trials under certain occasions, though, as a practical matter, in many instances—perhaps most—such jury trials were only carried on with consent at least in non-core cases. The litigation history is canvassed, as is everything else relating to jury trials and bankruptcy, in the comprehensive article by Professor S. Elizabeth Gibson in the *University of Minnesota Law Review*, Volume 72, Page 968.

Since *Granfinanciera* has been decided, there have been two cases decided by courts of appeals addressing the issue directly. In my judgment, rather than undertake to canvass any of the decisions prior to *Granfinanciera*, it seems sufficient to address *Granfinanciera* itself and the decision of the Second Circuit, which is *In re Ben Cooper*, 896 F.2d 1394, decided this past February, and *In re United Missouri Bank of Kansas City*, 901 F.2d, 1449, the Eighth Circuit decision in April.

*Granfinanciera* concluded that, in the case there before the Court, there was a Seventh Amendment entitlement to a jury trial. The Court's opinion was written by Justice Brennan, the author of the *Mara-*

*thon* opinion. There were three dissenting Justices in *Granfinanciera*. The dissenting opinion was written by Justice White, who had written the principal dissent in *Marathon*. Joining Justice White were Justices Blackmun and O'Connor.

Much of the dissent was taken up by argumentation that trial by jury was incompatible with the essentially equitable character of bankruptcy adjudication. The predicate for that argument was that what the Court was determining, at least by implication, was that claims falling within the purview of the Seventh Amendment not only had to be tried by juries, but that those jury trials would take place under the supervision of bankruptcy judges rather than district judges.

The Court's opinion is careful to reserve the question whether the mandated jury trial can be held in a bankruptcy court, or whether Congress has not authorized bankruptcy courts to conduct jury trials, with the result that any bankruptcy claim in which a jury trial is called for would have to be withdrawn for the disposition of that claim to the district court for jury trial.

It is the case that Justice Brennan in his opinion took issue with at least one of the grounds on which Justice White argued that juries in bankruptcy courts were inappropriate. The particular issue was Justice White's claim that a jury's principal function is to insure a decider which is independent of judges who are appointed for life—namely Article III judges—and who, therefore, have at least the potential for being irresponsible. Such a jury function, Justice White argued, would not be appropriate in a non-Article III court, where the judge would not be that independent and, therefore, not that potentially irresponsible.

Justice Brennan countered that argument by saying that juries could well be a restraint on non-Article III judges, whose lack of tenure and of constitutionally undiminishable compensation would leave them open to the possibilities of those pressures that Article III was supposed to protect Article III judges against. That is to say, Justice Brennan said that a jury could perform as appropriate a function—albeit

from a different direction in a bankruptcy court or other non-Article III court—as it performs in an Article III court.

But, apart from making that statement, by way of refutation of Justice White's argument, the Court majority did not decide the issue, which subsequently has been decided directly by the Second Circuit, on the one hand, and the Eighth Circuit on the other. The Second Circuit, in *In re Ben Cooper*, reviewed the 1984 bankruptcy legislation, and recognized that there is no provision in the current statute which in any express way authorizes bankruptcy courts to conduct jury trials. The only existing statutory provision that deals with juries at all is Section 1411 of Title 28, which says mysteriously: "(a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.

"(b) The district court may order the issues arising under Section 303 of Title 11 to be tried without a jury."

(Section 303 relates to involuntary bankruptcies.)

The language of Section 1411(a) can be paired with the language in 28 U.S.C. 157(b)(5), the last paragraph of the statute dealing with core proceedings, which says this: "The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending."

Reading Section 1411 together with Section 157(b)(5), one can reasonably conclude that Section 1411(a), in referring to "any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim," is referring to proceedings that will be handled by a district court rather than by a bankruptcy judge. But, apart from that, there is nothing express

which sheds light on whether other claims may be tried by jury in a bankruptcy court.

Section 1411 is understood to have accomplished the repeal of Section 1480, which existed under the 1978 Act, which recited that, "Except as provided in Subsection (b) of this section, this chapter and Title 11 do not affect any right to trial by jury, in a case under Title 11 or in a proceeding arising under Title 11 or arising in or related to a case under Title 11, that is provided by any statute in effect on September 30, 1979."

What the meaning of Section 1411 is has eluded almost all judges and scholars. I do not propose to add any syllable of further conjecture. I think we may take as fact what the Second Circuit said on the authority of the Gibson article, to which I have referred, which, as I say, was a pre-*Granfinanciera* article by one year.

In referring to Section 1411, the Second Circuit said, "This provision does not even make clear whether jury trials are afforded for other actions, let alone the proper forum for those trials. Of course, *Granfinanciera* has clarified the former issue, holding that jury trials are to be afforded for all legal actions.

■ Despite the lack of a specific statutory provision, we, nevertheless, hold that the bankruptcy courts may conduct jury trials in core proceedings. This is the position taken by the majority of courts which have considered this issue." And then the Second Circuit refers to the Gibson article.

Then the Second Circuit goes on to explain its holding. "Our holding rests on two separate but related provisions. The first provision is 28 U.S.C. Section 151, which states that 'each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit or proceeding.' The second provision is Section 157(b), which, as stated previously, gives bankruptcy judges the authority to conduct trials and issue final orders in core proceedings. *Granfinanciera* teaches that such proceedings, if legal in nature, are subject to the Seventh Amendment, but that opinion does not alter Congress' intent

that they be heard by a bankruptcy court with authority to issue final orders. Construing the Bankruptcy Code to allow jury trials in the bankruptcy court is the only way to reconcile these various concerns." That's at page 1402 of 896 F.2d.

The Eighth Circuit, in its more recent examination in *United Missouri Bank*, 901 F.2d 1449 (1990), reviewed the statutory material and decided, as is incontestable, that there is no express language in any federal statute affirmatively conferring authority on bankruptcy judges to hold jury trials. The Eighth Circuit then examined the legislation to determine whether the legislation by implication conferred such authority. The Eighth Circuit was unable to find any such implication.

The Eighth Circuit recognized that *Granfinanciera* called for jury trials of adversary proceedings that were legal in nature. The Eighth Circuit noted the Second Circuit's analysis, but found that analysis ultimately unpersuasive. Basically, the thrust of the Eighth Circuit's decision was that though *Granfinanciera* called for jury trials, and conducting jury trials in bankruptcy courts would be a way of meeting that constitutional mandate, it was not "indispensable" to accomplishing the constitutional demand. I take "indispensable" from the Eighth Circuit's reference to Sutherland on statutory construction. "The power to be implied ... must be practically indispensable and essential in order to execute the power actually conferred." 901 F.2d at 1456 (citing 2A Sutherland Stat. Const. Section 55.03).

There is, of course, no question that the constitutional mandate can be vindicated by conducting jury trials in the district court. The question then is whether we should, as the Eighth Circuit instructs—finding no express authority, and finding nothing either that clearly implies such authority or that necessitates a determination that such an authority exists—conclude that Congress has, in effect, directed that bankruptcy courts not try jury cases.

The Eighth Circuit's analysis is a persuasive one, following the general pattern of judicial responsibility, to examine legisla-

tion first for express and then for implied instruction. I cannot fault the Court of Appeals for the Eighth Circuit's conclusion that here there is little that operates as a recognizable directive that Congress contemplated jury trials in bankruptcy courts.

On the other hand, it strikes me that this is really not a situation in which the inquiry should end at the point of saying, 'we find no reasonably clear signal that Congress intended bankruptcy courts to try jury cases.'

I suggest that what we have here is a situation in which the search for Congressional direction, express or implied, is an illusory search. We really have no ground for supposing that Congress in any systematic sense addressed the question of whether bankruptcy courts should hold jury trials one way or another. Congress clearly was concerned about whether bankruptcy courts should be made Article III courts, and it decided in the negative. Congress was clearly concerned about setting up a structure under which so-called "*Marathon*-type" cases would be subjected to the *de novo* review that would make the process compatible with the requirements of Article III, as sketched out in *Marathon*, and separating those "*Marathon*-type" cases from other cases, the vast majority of core cases, in which final disposition could be entrusted to the bankruptcy court subject to ordinary appellate review.

But the question which is at the heart of our inquiry—where jury trials could be conducted if they were called for in bankruptcy matters—simply does not seem to have been addressed by Congress at all.

We can, of course, follow the lead of the Eighth Circuit, which in effect says, since Congress has given no affirmative direction for bankruptcy courts to try jury cases, and since of course district courts have such authority, we will rely on district courts to conduct jury cases unless and until Congress decides to expand the authority of bankruptcy courts in the direction of holding jury trials, as Congress presumably can.

That would certainly be an appropriate judicial response, and yet I suggest that in

this rather unusual rubric a better response would be to follow the lines laid out by the Second Circuit. The question whether the bankruptcy court can hold jury trials was not addressed by Congress because Congress had its attention focused on the issues which had been expressly put on Congress' agenda by the Supreme Court in *Marathon*. It is the federal judiciary and most particularly the Supreme Court which has been the catalyst of the new bankruptcy structure which we are all now administering.

It should not be surprising to us that Congress did not attend to this particular question that confronts us today, important as that question is. Since the basic initiative came from the Supreme Court, and Congress was in the 1984 legislation doing its best to react to that initiative, it strikes me that the responsible course for the judiciary to take with respect to an issue which Congress didn't look at, but which must now be resolved, is to resolve that issue along the lines that to the judiciary makes most sense as a matter of judicial administration, given the predicate, which seems indisputable, that Congress has offered no direction one way or another.

If the matter is candidly resolved in terms of what the judiciary, and ultimately the Supreme Court, regards as the sound mode of judicial administration, it remains, of course, open to Congress to alter that determination immediately by legislation. But it strikes me that the responsible course is for the judiciary not to ask impossible questions about the intention of legislators who really had no intention, but to ask questions which go to what makes for sound management of the bankruptcy process, a process committed by Congress to the judicial branch.

What is the sensible way to resolve this matter in terms of policy? Is it sensible to have the bulk of the aspects of the bankruptcy process committed to bankruptcy judges, but with transfer to a district court of those claims that require jury treatment? On the face of it, that does not sound like an efficient use of the time either of bankruptcy courts or district courts.

Professor Gibson put the question and gave the answer in language which it would not be inappropriate to read here. "If the Seventh Amendment guarantees litigants the right to a jury in certain bankruptcy matters, it must be determined who may conduct the jury trial. The logical choice is a bankruptcy judge." That's at page 1027 of Volume 72 of the Minnesota Law Review.

Professor Gibson does not contend that the legislation as it now stands contemplates such an arrangement. She simply submits that that is the sensible form of administration, and that maybe ultimately the problem should be resolved by turning bankruptcy judges into Article III judges.

My resolution of the issue, as it stands before us, is to conclude that bankruptcy courts can try jury cases where the claims are ·core claims. Where the claims are non-core claims, jury disposition would be inappropriate because non-core claims are subject to *de novo* review, and *de novo* review would, of course, be incompatible with the stricture of the Seventh Amendment that facts determined by a jury, determined with finality, not be reassessed by any higher judicial authority.

It remains to say that the Eighth Circuit did point out that part of its reservations about reaching the result arrived at by the Second Circuit was that to conclude that bankruptcy courts would try jury cases would be a conclusion that in turn would generate certain significant constitutional issues that could be avoided by confining jury trials to district courts. The Eighth Circuit did not undertake to spell out just what constitutional concerns it had.

The Second Circuit referred to two constitutional concerns, and found neither of them to be of consequence. I join the Second Circuit in that view. One of the identified concerns was whether it would be consistent with Article III for a non-Article III court to conduct a jury trial. The question is one which, to my mind, admits of a clear answer. If it is consistent with Article III to have a claim, of the kind

which is now before this court, addressed by a non-Article III court dispositively subject to regular appellate review, the introduction of a jury into that process does not change the constitutional equation. The propriety, in terms of compatibility with Article III, of having core claims determined by a non-Article III tribunal, namely the bankruptcy court, has been demonstrated, in my judgment, fully by Judge Breyer's excellent opinion in *Arnold.*

I rely on that decision, and would simply add that, to then include a jury in the armament of the non-Article III tribunal seems to me in no way to add anything unconstitutional to the equation.

The other asserted constitutional concern is whether a jury trial in a non-Article III court satisfies the Seventh Amendment. As to that, I think there can be no real doubt. We have had non-Article III courts administering federal justice with juries for the major part of our history. The sufficiency, for Seventh Amendment purposes, of a jury in a non-Article III court has never, so far as I know, been brought into serious question.

The Supreme Court, in 1974, in *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198, (1974), made it plain that the Seventh Amendment mandated a jury trial in the non-Article III civil courts staffing the District of Columbia, when the claim in suit was one which conventionally, as of 1791, would have called for a jury trial.

The *Pernell* decision by Justice Marshall for a unanimous court—that is to say the judgment was unanimous, with Chief Justice Burger and Justice Douglas concurring in the result—is, I will note, also authority for the proposition that the Seventh Amendment right runs to both parties. I make that point because I think in the case before us, as a matter of cognate logic, the Seventh Amendment right is one assertible by the trustee, as it was here, or by the defendants. Justice Marshall said at page 376, at page 1730 of 94 S.Ct., of *Pernell,* "Since the right to recover possession of real property governed by Section 16–1501 was a right ascertained and protected by

courts at common law, the Seventh Amendment preserves to either party the right to trial by jury."

And so I conclude that the attribution that the bankruptcy courts have authority to conduct jury trials is an attribution which carries with it no constitutional dangers. On the other hand, it is, in my judgment, a way of vindicating, in the most efficient way possible, the constitutional mandate for a jury trial of such core legal claims as may arise in bankruptcy in an adversary setting, as called for by the majority of the Court in *Granfinanciera.*

So, for the reasons that I have outlined, I conclude that Judge Scholl's decision should be affirmed in its entirety, and I will enter an order to that effect.

I express to you all my gratitude for your further exhibition of patience in listening to this extended discussion, and I hope you will now get a well-earned and much-too-long-delayed lunch.

I thank you all.

## ON MOTION FOR RECONSIDERATION

Defendants Henry Wessel and Alan S. Carpel, and the defendant law partnership of Wessel & Carpel, have moved for reconsideration of the Order of August 15, 1990, affirming Bankruptcy Judge Scholl's decision directing that this case be tried by a jury in the Bankruptcy Court. Defendants contend that (1) the bench opinion explaining the August 15, 1990 Order is wrong on the merits, and (2) in any event, given that the question whether a bankruptcy court can conduct a jury trial is now pending before the Supreme Court on certiorari, it was inappropriate for this court to direct that the instant litigation go forward in a manner that the Supreme Court may soon disallow.

1.

The Eighth Circuit, in *In re United Missouri Bank of Kansas City, N.A.,* 901 F.2d 1449 (8th Cir.1990) has ably developed the arguments that militate against the conclusion that bankruptcy courts are authorized to conduct jury trials. I do not take issue with that court's point that there is no

express language in the Bankruptcy Code authorizing bankruptcy courts to hold jury trials. Nor do I quarrel with the court's further point that the legislative history contains no compelling affirmative evidence that Congress intended bankruptcy courts to have authority to hold jury trials. On the other hand, the legislative history also contains no compelling affirmative evidence that Congress intended to *deny* bankruptcy courts that authority. The reason for the dearth of evidence either way is not hard to find: Congress, acting in 1984 to restructure bankruptcy procedure in the face of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), apparently was not impelled to think about the jury trial issue one way or another. Nor is this surprising. The Supreme Court's decision in *Granfinanciera, S.A. v. Nordberg*, —— U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)—the decision which, for the first time, authoritatively defined the issue as one that would have to be addressed forthwith—was not handed down until 1989.

In the face of the 1984 legislative vacuum, I see no reason to say that the burden of proving a non-provable, because non-existent, legislative intent, rests with the proponents, rather than with the opponents, of bankruptcy court jury trials. Rather, the better part of wisdom is found in the Second Circuit's formulation in *In re Ben Cooper, Inc.* 896 F.2d 1394, 1402 (2nd Cir.1990), *cert. granted* —— U.S. ——, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990):

> Our holding rests on two separate but related provisions. The first provision is 28 U.S.C. § 151 (1988), which states that "[e]ach bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit or proceedings." The second provision is § 157(b), which, as stated previously, gives bankruptcy judges the authority to conduct trials and issue final orders in core proceedings. *Granfinanciera* teaches that such proceedings, if legal in nature, are subject to the Seventh Amendment, but that opinion does not

alter Congress' intent that they be heard by a bankruptcy court with authority to issue final orders. Construing the Bankruptcy Code to allow jury trials in the bankruptcy court is the only way to reconcile these various concerns.

I am not quite prepared to say, with the Second Circuit, that "to allow jury trials in the bankruptcy court is the only way to reconcile these various concerns." Conducting the jury phase of a core proceeding in the district court, with all other phases in the bankruptcy court, could be managed. But it would be markedly inefficient—a very poor way to handle judicial business. Therefore, it makes sense to conclude that, if Congress in 1984 had been faced with the issue brought to the fore five years later by *Granfinanciera*, Congress would have voted to affirm the authority of bankruptcy courts to conduct jury trials.

2.

The motion for reconsideration suggests that my August 15, 1990 ruling show unawareness—or, in the alternative, disregard—of the Supreme Court's grant of certiorari to review the Second Circuit's decision in *In re Ben Cooper*. I am aware of the grant of certiorari. What the grant of certiorari signifies is that the Court expects to address and resolve the conflict between the Second and Eighth Circuits. The grant of certiorari does not furnish evidence on which way the conflict will be resolved. Under these circumstances, I conceive it my duty to declare the rights of the parties according to the legal principles that now govern the controversy.

Conclusion

For the foregoing reasons, the motion for reconsideration will be denied in an Order accompanying this Memorandum.

ORDER

For the reasons stated in the accompanying Memorandum, defendants' motion for reconsideration of the Order of August 15, 1990, is denied.