In re SUMMIT AIRLINES, INC., Debtor.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON BEHALF OF SUMMIT AIRLINES, INC., Plaintiff,

v.

Jonathan GANZ, Allen Dubroff, Astor, Weiss & Newman, Paul C. Astor, Sandra Schultz Newman,. G. David Rosenblum, Arthur H. Kaplan, David S. Workman, David S. Mandel, Allen B. Dubroff, d/b/a Astor, Weiss & Newman, Rawle & Henderson, J. Grant McCabe, III, Peter C. Paul, Henry C. Lucas, III, Morton F. Daller, Carl D. Buchholz, III, Alan Greenberg, Peter J. Weber, James C. Stroud, Warren L. Simpson, Jr., Patricia A. Mattern, James B. Kozloff, Wendy H. Kock, Thomas P. Wagner, Michael Slotznik, Edward A. Greenberg, H. Coleman Switkay, John S. Bagby, Jr., Fred B. Buck, John H. McCarthy, Clifford A. Goldstein, Thomas A. Kuzmick, Patrick J. Stapleton, III, Tina L. Nugent, and Jonathan H. Ganz, d/b/a Rawle & Henderson, Defendants,

RAWLE & HENDERSON, Allen B. Dubroff, Astor, Weiss & Newman, Paul C. Astor, Sandra Schultz Newman, Arthur H. Kaplan, David S. Workman and David S. Mandel, Third Party Plaintiffs,

v.

REGENT NATIONAL BANK, PNC Bank, Third Party Defendants.

Bankruptcy No. 88–10911DAS.

Adv. No. 93–0306DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 16, 1993.

Allen B. Dubroff, Joseph B. Finlay, Jr., Astor, Weiss & Newman, Philadelphia, PA, for debtor.

Mary F. Walrath, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for Creditors' Committee.

John W. Morris, Philadelphia, PA, Special Counsel for Creditors' Committee.

H. Marc Tepper, Margolis, Edelstein & Scherlis, Philadelphia, PA, for Astor, Weiss & Newman and its partners.

Walter J. Weir, Patterson & Weir, Philadelphia, PA, for defendant Rawle & Henderson and its partners.·

Steven E. Ostrow, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, for Regent Bank.

William A. Harvey, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for former defendant PNC Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before this court in the instant proceeding to recover funds embezzled from the estate of SUMMIT AIRLINES, INC. ("the Debtor") by Defendant JONATHAN H. GANZ, naming as defendants Ganz, two law firms for which he worked, and all of the partners of those firms, are numerous motions seeking to resolve, as a matter of law, many of the substantive and procedural issues arising in the proceeding, scheduled to be tried before this court on November 18, 1993. At this juncture, we are prepared to decide two of these motions, which we believe will be dispositive of many, if not all, of the claims raised in the matter. First, we find that the motion of the Plaintiff OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtor ("the Plaintiff") for partial summary judgment on the issue of liability against Defendant ASTOR, WEISS & NEWMAN ("the Astor Firm"), the firm employed by the Debtor and of which Ganz was a

partner at the time of most of the defalcations in issue, must be granted. Second, we conclude that the motion of Third-party Defendant REGENT BANK ("Regent") to dismiss the Third-party Complaint of the Astor Firm against it on jurisdictional grounds must also be granted.

We recognize that these decisions leave the Astor Firm in the uncomfortable position of being subject to liability in this proceeding, while being compelled to pursue the party which it believes was primarily responsible for the misappropriations in issue, *i.e.*, Regent, in another forum. However, these unfortunate consequences are not only legally inescapable, but also they further the public policy of rendering the party with the closest relationship with the wrongdoer, and hence the party normally with the best opportunity to halt such practices, responsible for ferreting out embezzlement by members of the bar, *i.e.*, the law firm which hired and hoped to profit from the deeds of the now-errant partner.

## B. PROCEDURAL AND FACTUAL BACKGROUND

The bankruptcy case underlying the instant regrettable circumstances was initiated by the filing of an involuntary Chapter 7 bankruptcy petition against the Debtor on March 18, 1988. An Order for relief under Chapter 11 was entered on May 9, 1988. On May 11, 1988, Defendant ALLEN B. DUBROFF, ESQUIRE, moved for the appointment of a "boutique" bankruptcy law firm of which he was then a partner, Pincus, Verlin, Hahn, and Reich ("the Pincus Firm"), as counsel for the Debtor. The application was granted on May 13, 1988.

In his deposition, Dubroff described the highlights of the case. He stated that it featured a bidding war between two European airlines for certain air rights of the Debtor, which itself no longer did business. The ensuring auction of the Debtor's property yielded an unanticipated bounty of several million dollars, resulting in net assets of several hundred thousand dollars after satisfaction of all secured claims against the Debtor. A liquidating Chapter 11 plan, formulated to dispose of the remaining assets, was confirmed on June 21, 1989.

In fall, 1989, Dubroff stated that he became deeply involved in negotiating the terms of the ultimate merger of the practice of approximately seven lawyers then constituting the Pincus Firm into the Astor Firm. In his deposition, Dubroff, with perhaps unjustified modesty, described Ganz, the only other ex-Pincus Firm attorney who became an Astor Firm partner after the merger, as the more brilliant practitioner and hence as the *de facto* managing partner of these attorneys when they settled in as the bankruptcy group at the Astor Firm. In response to Ganz's offer to help with several of his cases to lighten Dubroff's remaining workload, Dubroff therefore had no reservations about assigning the remaining tasks in the Debtor's case, believed to be litigation of accounts receivable and preference actions, to Ganz.

Unfortunately, during his stewardship of the case, Ganz utilized several checks drawn on the debtor-in-possession account opened by Dubroff at Provident National Bank ("Provident"), which were executed by Dubroff in blank to pay the filing fees of these anticipated legal actions, to withdraw an amount of funds from the Debtor's estate in excess of $500,000; deposit these funds into an account established by him at Regent, entitled "Jonathan H. Ganz, Esq., Attorney for Summit Airlines, Inc.;" and to ultimately convert these funds to his own use.

The Astor Firm was appointed as counsel for the Debtor to replace the then-dissolved Pincus Firm on January 19, 1990. In August, 1991, Ganz, then still in good standing, resigned from the Astor Firm and became a partner in the law firm of Rawle and Henderson ("the Rawle Firm"). Ganz testified, in his deposition, that, while he took the Debtor's case file with him to the Rawle Firm, very little legal activity was needed or undertaken thereafter.

So well had Ganz chosen his victim that neither the Plaintiff, though represented by astute bankruptcy counsel, nor any other interested party, detected his sizable defalcation until well after a Final Decree was entered in this case on November 8, 1991, and the case was closed on December 17, 1991.

Ganz first made the court and the United States Attorney aware of the general nature of his grossly improper actions and identified this case as a target of his improprieties when his various embezzlements came to light in February, 1992.

Although the nature of Ganz's actions were generally known to the bar shortly after February, 1992, it is not clear that the identity of this case as one of his targets was publicized. The Plaintiff apparently did not become aware that this Debtor's estate was a victim of Ganz's campaign of dishonesty until shortly before November 19, 1992, when it successfully moved to reopen this case in contemplation of filing this proceeding. On April 8, 1993, the instant proceeding was filed.

The Complaint is divided into five Counts, each of which are apparently directed to all of the Defendants, titled as follows: (I)—Turnover; (II)—Bailment and Breach of Trust; (III)—Tortious Conversion; (IV)—Negligence; and (V)—Disgorgement of Compensation. After a conference with counsel on the original trial date of June 16, 1993, we readily agreed to continue the trial until September 1, 1993. On June 23, 1993, and June 28, 1993, respectively, the Rawle Firm and the Astor Firm filed Answers to the Complaint and Third–Party Complaints against Regent. As the parties apparently now agree that the activities of Ganz while he was at the Rawle Firm involved less than a total of $7,000, that firm has neither been the focus of, nor the moving party in, any of the ·flurry of recent pre-trial motions.

On August 13, 1993, Regent answered the Third–Party Complaints filed against it. On literally the eve of the September 1, 1993, trial date, the Astor Firm also moved to join PNC Bank ("PNC"), the successor to Provident, where Dubroff had established his accounts for the Debtor, as an additional third-party defendant. On September 9, 1993, having, with some reluctance, continued the trial to at least that date, we entered an Order joining PNC as a third-party defendant; requiring it to answer the complaint against it by September 30, 1993; directing that all discovery be completed by October 29, 1993; and allowing that the trial of the ·

matter be continued to be heard on a must-be-tried basis on November 18, 1993. PNC was subsequently voluntarily dismissed as a party by agreement of all of the other interested parties on October 1, 1993. Regent filed an Amended Answer to the Third–Party Complaint of the Astor Firm against it on September 27, 1993.

The volley of motions before us began with the filing of the Plaintiff's Motion for Partial Summary Judgment against the Astor Firm, with an accompanying Memorandum of Law, on October 12, 1993 ("the PSJ Motion"). Without specifying the precise Counts of the Complaint on the basis of which judgment was sought, the PSJ Motion sought a declaration that the Astor Firm was liable to the Plaintiff for all funds of the Debtor collected and improperly confiscated by Ganz prior to August 1, 1991, which was the approximate date of Ganz's resignation from the Astor Firm to join the Rawle Firm. Upon becoming aware of the PSJ Motion, we entered an Order of October 18, 1993, according the Astor Firm, or any other interested party, the opportunity to file an Answer and Brief in response thereto on or before October 29, 1993.

On October 19, 1993, the Astor Firm, without hesitation, filed a two-page Memorandum of Law which purportedly responded to the PSJ Motion. The only points made in the Memorandum were that (1) the extent of the Astor Firm's liability could not be ascertained without an analysis of all of the checks that were forthcoming in discovery; and (2) the "ultimate liability" for Ganz's illegal actions rested not with the Astor Firm, but with Regent.

The latter point was punctuated with the filing, on October 25, 1993, of a Motion of the Astor Firm seeking summary judgment against Regent on the issue of liability on its third-party claim ("the Astor Motion"). This Motion was supported with a 31–page Memorandum of Law and a thick bound Appendix of exhibits and copies of relevant case authorities. We ordered that Regent or any other interested party respond to the Astor Motion by November 5, 1993.

The *Astor Motion* produced responses from Regent which can only be classified as ballistic. On November 1, 1993, Regent filed a demand for a jury trial on the Third-party Complaint against it. This was followed by a filing, on November 3, 1993, of a Motion to Dismiss the Third-party Complaint against it · on the basis of lack of this court's subject matter jurisdiction to hear it, or alternatively, for us to stay this proceeding pending the disposition of a motion to withdraw the reference of the claims against it to the district court ("the Dismissal Motion"). In response to these filings, we entered an Order of November 4, 1993, in which we directed Regent and allowed other parties to address the issue of whether Regent's jury demand was timely by November 10, 1993. In response to the Dismissal Motion, we entered a further Order of November 5, 1993, directing that all responses to the Dismissal Motion be filed by November 12, 1993, and stating that it was unlikely that this court would entertain any additional pre-trial motions. However, later in that day of November 5, 1993, Regent filed not only an Answer to the Astor Motion, but also a Cross–Motion for summary judgment against the Astor Firm in the event that this court concluded that it has jurisdiction to hear this claim, supported with a 41–page Memorandum of Law.

The parties produced a grand finale of filings just before and on November 12, 1993, the Plaintiff filed the second of two supplemental Memoranda supporting the PSJ Motion and expressing its lack of interest in the Astor Firm/Regent dispute except insofar as it opposed any delay in the resolution of its own claims as a result of the process of the resolution of that dispute. The Astor Firm, addressing the PSJ Motion, focused a new attack solely on Count III of the Complaint, the Tortious Conversion claim, suggesting, as with its very brief initial response to the PSJ Motion, that it had little in the way of defenses to most of the Plaintiff's claims. It also opposed the Dismissal Motion, arguing that the post-petition occurrence of the significant events rendered this entire proceeding core in nature. Finally, it moved to strike Regent's jury demand. Regent, apparently feeling the need, once it had begun, to keep the filings coming, presented Memoranda op-posing yet-unseen motions of Astor to strike its Cross–Motion for Summary Judgment as violative of the moratorium on further motions in our November 5, 1993, Order, and to strike any expert witnesses designated by Regent.

As noted at the outset, we deem it appropriate and dispositive to address, first, the PSJ Motion, and second, that aspect of the Dismissal Motion challenging our subject-matter jurisdiction to hear the Astor's Firm's Third-party Complaint against Regent.

## C. DISCUSSION

### 1. THE PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO LIABILITY AGAINST THE ASTOR FIRM.

 Summary judgment is a procedure established to permit prompt disposition of actions in which there is no genuine issue of material fact. Under Rule 56(c) of the Federal Rules of Civil Procedure ("F.R.Civ.P."), incorporated by reference into Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7056, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as to a matter of law." The plain language of this rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

 Summary judgment, in whole or whatever part of a matter can be so determined, *see* F.R.Civ.P. 56(d), may be appropriate even where there exists some alleged factual disputes between the parties. However, the existence of factual disputes will not necessarily defeat an otherwise properly supported motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510. The function of the judge at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue which must be tried. *Id.* at 249, 106 S.Ct. at 2511. Those facts at issue must be viewed in a light most favorable to the non-moving party. *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3rd Cir.1982).

If we find that the moving party, here the Plaintiff, has sustained its initial burden of demonstrating the absence of a genuine issue of material fact under F.R.Civ.P. 56(c), then the non-moving party, here the Astor Firm, must establish that there is a genuine issue of material fact to successfully oppose summary disposition of the matter. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This showing must have two components here. First, the Astor Firm must establish an issue of fact which, if resolved in its favor, would support the conclusion that it should not, as a firm, be held liable for any funds belonging or due to the Plaintiff which Ganz collected and then stole prior to August 1, 1991. Second, the issue of fact it raises must be genuine. It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*, 475 U.S. at 586, 106 S.Ct. at 1356.

We conclude that the Astor Firm has not been able to even attempt to establish, and therefore has not been able to establish; that a genuine issue of material fact exists which would preclude the entry of judgment in favor of the Plaintiff and against it as a matter of law. The Plaintiff has, in its Complaint, claimed that the Astor Firm is liable to it based upon the uncontested factual allegations that money collected and held by one of its partners was stolen by that partner. The Astor Firm, in its Answer to the Committee's allegations, disputes its liability. However, this liability is disputed on only the following grounds: (1) since Ganz rather than the Astor Firm took the money, Ganz alone is liable therefor; (2) the Bank is liable over to it for allowing Ganz to carry out his embezzlement scheme; and (3) no claims of tortious conversion were proven as to any individual except (admittedly) Ganz.

In responding to the Astor Firm's first argument, its attempt to have Ganz alone be held subject to liability, we begin by noting that attorneys are not entitled to take, use, or "borrow" their client's money. Therefore, Ganz is unmistakably liable to the Plaintiff for his actions. An attorney stands in a relation of trust and confidence to his client. The existence of this relationship imposes upon an attorney an absolute duty to account for the funds that the attorney's client entrusts to him. *Ringer v. Finfrock*, 340 Pa. 458, 461–62, 17 A.2d 348, 450–51 (1941). It has been said that, in most circumstances, an attorney is not liable for money collected for his client until demand for same is made by the client. *Krause v. Dorrance*, 10 Pa. 462, 463–464 (1849). However, an attorney is unmistakably liable to the client "when the attorney has been guilty of fraud or malpractice, or of culpable negligence in not giving notice of receipt of the money in a reasonable time; or ... when he exhibits a manifest desire to baffle the plaintiff, and withhold from him his just demand." *Id.* at 464. There is no doubt that Ganz is guilty of fraud, malpractice, and the worst sort of "bafflement" of the Plaintiff with respect to the funds entrusted to him. Therefore, he is indisputably liable for his embezzlement. No one, neither the Astor Firm nor Ganz himself, argue to the contrary.

It is only slightly more elementary that the law firm partnerships which included Ganz as a partner at the time that he committed his embezzlements are equally liable with Ganz for his wrongful actions, irrespective of the apparent complete innocence of all of the other co-partners. Early cases in Pennsylvania and other jurisdictions imposed liability on law firms for the repayment obligations of one of their partners. For example, in *Nisbet v. Patton*, 4 Rawle 120, 123 (Pa.1833), the Pennsylvania Supreme Court reasoned that a law firm *is* its partners and, where one partner holds and

fails to re-deliver money held, all of the partners are charged with a duty to repay. Though confusing its pronouncement by utilizing double negatives, the court says that "it is not easy to see why a partner should not be answerable to the firm, as in any other case of principal and agent, for gross and wilful misfeasance." *Id.* In *Whitaker v. Kesler*, 3 Ky.Op. 236 (1869), the court held that, where one member of a law firm collects moneys of a client of the firm, the other members of the firm are personally liable to the client therefor. Lack of knowledge by the firm was no defense; the entire firm was held liable because the collection of the money by one of its members imposed a repayment obligation upon the entire firm. *Id.* at 237.

An even more extreme instance of firm responsibility for the acts of one of its partners is found in *Naltner v. Dolan*, 108 Ind. 500, 8 N.E. 289 (1886). There, money belonging to a client was collected for him by his attorney and deposited in a bank of good standing in the name of the attorney. The attorney collecting the money belonging to his client came to occupy the title of trustee as to those funds. Upon the Bank's failure, the attorney and his firm became obligated for the loss as any other trustee would become liable. They became, in fact, insurers of the client, owing repayment regardless of how the loss occurred. *Id.* 8 N.E. at 290–291.

Similar applications of the theory of firm liability are found even in cases where the firm dissolved. In the nearly identical cases of *Smythe v. Harvie*, 31 Ill. 62, 67 (1863); and *Bryant v. Hawkins*, 47 Mo. 410, 411–412 (1871), the respective courts held that the collection of notes or funds of a client by his attorney was a partnership duty, and it continued with each member after the dissolution of the firm. A law firm was therefore held jointly and severally liable for money collected by one of its attorneys on behalf of a client.

The principles of these early cases have not been questioned since. Thus, this court similarly held, in *In re Direct Satellite Communications, Inc.*, 96 B.R. 507, 524 (Bankr. E.D.Pa.1989), that a law firm was obliged to forfeit its entire engagement fee of $368,-087.05 because of grossly unethical actions by the partner in charge of the engagement. We stated that

> [w]e have no hesitancy in finding [the firm] totally liable for [the attorney's] actions. He was a partner, and was clearly acting in the scope of his firm's ordinary course of business when he committed the acts in issue. *Id.*

Numerous cases have reached the same conclusion regarding firm liability through application of the law of agency. Rather than starting with the essence and duties of the firm, these cases, never losing sight of the fact that a non-corporate business entity *is* the individuals of which it is composed, begin with the analysis of the binding effect of an agent's individual activity.

▆ In summarizing these principles, the RESTATEMENT (SECOND) OF AGENCY § 261, at 570 (1958) ("the Restatement"), states that

> [a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within the scope of his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

The Comment and examples to § 261, *id.* at 571, make it absolutely clear that such *respondeat superior* liability exists even where the principal is entirely innocent of involvement in the agency's actions and has derived no benefit therefrom.

The Pennsylvania Supreme Court adopted § 261 of the Restatement in *First Nat'l Bank v. Turchetta*, 407 Pa. 511, 181 A.2d 285 (1962). In that case, the Turchetta brothers created a business partnership for the purpose of buying and selling used motor vehicles. The brothers financed partnership sales of automobiles with the plaintiff and with the Central Trust Company via an agreement whereby funds would be advanced upon presentation of certain documents. One of the brothers created phony documents and absconded with the money which the bank advanced in response to these documents. In applying § 261 of the Restatement to the facts before it, the court held

that the partnership was liable to the bank despite its innocence, lack of benefit, and claim that the errant brother lacked authority to take the money. *Id.* 181 A.2d at 287–88.

■ The Pennsylvania courts applied similar principles of agency law even before the promulgation of the Restatement. In *Guillou v. Peterson,* 89 Pa. 163, 172 (1879), the court held that an innocent co-partner was liable despite his lack of notice or knowledge of the borrowing of securities or their conversion by his partners. Although neither *Turchetta, Guillou,* or the Restatement illustrate examples of law firms specifically, it is inconceivable that law-firm partnerships could be held to a lower standard than other partnerships. Therefore, as long as an agent of a partnership acts with apparent authority for the firm or within the scope of the agent's apparent capacity to act for the firm, the entire firm will be held liable for the acts or omission of its agent. *See, e.g., Cook v. Brundidge, Fountain, Elliott & Churchill,* 533 S.W.2d 751 (Tex.1976) (a partner in a law firm was "acting within the scope of his apparent authority" when he received money from and property of the plaintiffs, his clients, and that the law firm would be "bound to make good the loss" for the partner's misappropriation of funds).

■ In all of the aforementioned examples, there emerges a clear precept that a partnership and every member thereof is liable for the losses occasioned by one of its members acting within the scope of the firm's business, even though the persons sought to be charged did not participate in, ratify, or have knowledge of the conduct. Authoritative law makes it clear that when an agent, whether an independent agent, employee, or partner, collects money in relation to the firm's business, the firm stands liable for any subsequent loss of the money regardless of its innocence or lack of authorization.

■ The Astor Firm, as appointed counsel for the Debtor, held the Debtor's funds in its capacity as attorney and distributing agent. It specifically undertook to, and succeeded in, collecting funds through the sale of the Debtor's assets and, later, from the prosecution of preference actions. There is no question that all of this was done in the actual course of the firm's business. Therefore, the Astor Firm is liable to the Plaintiff under the precepts of agency law for the money embezzled from its estate by Ganz. The Astor Firm's plea that it never authorized Ganz to take the money and that it never knew that all the money had disappeared is irrelevant.

A parallel basis of liability is found in partnership law, as contained in the Pennsylvania Uniform Partnership Act, 15 Pa.C.S. §§ 8301, *et seq.* ("the UPA"). The UPA incorporates, in specific terms, both of the concepts of partnership liability set forth above. The agency law approach is based in 15 Pa.C.S. § 8321, which provides as follows regarding partnership acts:

§ **8321. Partner agent of partnership as to partnership business**

(a) **General rule.**—Every partner is an agent for the purpose of its business and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership unless the partner so acting has in fact no authority to act for the partnership in the particular matter and the person with whom he is dealing has knowledge of the fact that he has no such authority.

The consequences of this agency relationship in the event of wrongdoing by a partner are thusly specifically prescribed at 15 Pa.C.S. § 8325:

§ **8325. Wrongful act of partner**

Where, by wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

The consequences of a wrongful act by one of several partners is also specifically prescribed as follows:

## § 8326. Breach of trust by partner

The partnership is bound to make good the loss:

(1) Where one partner, acting within the scope of his apparent authority, receives money or property of a third person and misplaces it.

(2) Where the partnership, in the course of its business, receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership.

Applying the foregoing strictures of the UPA, we conclude the Ganz's misappropriation of the Debtor's funds is covered by 15 Pa.C.S. § 8326(2), and the misappropriation of the funds which he subsequently collected is covered by 15 Pa.C.S. § 8326(1). Both categories of embezzlement are covered by 15 Pa.C.S. § 8325, as well as by the previously cited law of agency which is expressly reiterated by the UPA. 15 Pa.C.S. § 8304(b). It can therefore be readily seen that application of the UPA produces identical or even clearer firm responsibility than the previously cited cases pertaining to firm liability and agency law.

The brief, almost superfluous efforts of the Astor Firm to defend against the Plaintiff's PSJ Motion, which contrast sharply with its vigorous efforts to render Regent liable with it or over to it, are indicative of the properly-perceived weakness of any direct defense of the Astor Firm to the Plaintiff's claims. No effort is made to produce facts which would support a different result than the declaration of liability sought by the Plaintiff in the PSJ Motion. The fact that this court cannot measure the precise amount of the Astor Firm's liability does not preclude our entry of partial summary judgment on the issue of its liability as to all funds which are proven to have passed out of the Debtor's account and into Ganz's hands personally while he was an Astor Firm partner. That is all that the Plaintiff requests in the PSJ Motion. We can and will order that only the amount of the Astor Firms' liability must be ascertained at trial if same cannot be agreed upon now that prolific discovery apparently engaged in by the various parties to this action

is presumably completed. *See* F.R.Civ.P. 56(d).

It is also immaterial, as we see it, that the Plaintiff is unable to make out a claim of "tortious conversion," as alleged in Count III of its Complaint, against the Astor Firm. The PSJ Motion makes very little reference to any of the rather vaguely-phrased Counts in the Complaint. The only matter of real importance is that the Astor Firm is in fact liable to the Plaintiff under several applicable legal theories.

Finally, the Astor Firm directs its attention almost exclusively to the potential liability of Regent with it or over to it. In so arguing, the Astor Firm relies heavily on *Levy v. First Pennsylvania Bank*, 338 Pa.Super. 73, 487 A.2d 857 (1985). In that case, a client victimized by embezzlement of a law partner, apparently having received substantial but not complete reimbursement by the embezzler's law partnership, sued the bank which cashed checks forged by the embezzler for the balance of his damages. The bank then sought to join the embezzler's partners as third-party defendants, on the ground that the law partners were necessarily liable over to it, even without proof of negligence on their part.

The *Levy* court, incidentally, had no difficulty with the question at issue on the PSJ Motion. It stated that the UPA "requires the partnership to reimburse the innocent client, and permits the partnership to recover its loss from the truly guilty party." 338 Pa.Super. at 84, 487 A.2d at 863. It merely held that "[t]he bank cannot use the Uniform Partnership Act to recover from the partnership for its own negligence." *Id.*

Here, the Plaintiff has chosen to sue, in the first instance, the law partnership, not, as in *Levy*, the bank which cashed the checks which passed the stolen funds to the embezzler. It may be that the Astor Firm, as it has attempted to do in this proceeding, could successfully obtain contribution from Regent if it were able to overcome Regent's statute of limitations defense, prove that Regent had been negligent, and prove that Regent's negligence, as opposed to or in addition to its own, caused the Plaintiff's loss. However,

nothing in the *Levy* opinion suggests that Regent's liability would relieve the Astor Firm of its own direct liability to the Plaintiff. Therefore, in any event, it is clear that the Astor Firm, in its charges against Regent, has not set forth any genuine issue of material fact which would entitle it to prevail in the face of the Plaintiff's PSJ Motion. Therefore, that Motion will be granted.

### 2. REGENT'S MOTION TO DISMISS THE THIRD–PARTY COMPLAINT AGAINST IT ON THE GROUND OF LACK OF SUBJECT–MATTER JURISDICTION OF THIS COURT TO HEAR IT WILL ALSO BE GRANTED.

We are now prepared to discuss that aspect of Regent's Dismissal Motion which challenges this court's subject-matter jurisdiction to hear the Third-party Complaint of the Astor Firm against Regent. Since we are prepared to sustain that aspect of the Dismissal Motion, we need not discuss any other aspect of that Motion, nor need we decide the Astor Motion, Regent's Cross–Motion for summary judgment, Regent's request to stay this proceeding pending resolution of its Motion to withdraw the reference of this claim to the district court, or Regent's potential right to a jury trial.[1]

The general jurisdiction of bankruptcy courts is set forth at 28 U.S.C. § 1334(b), which provides as follows:

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Consequently, a bankruptcy court may exercise jurisdiction over a matter if it (1) arises under Title 11; (2) "arises in" cases brought under Title 11; or (3) is "related to" a Title 11 matter.

Courts addressing the parameters of "arises under," "arising in," and "related to" jurisdiction have held that

"it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under' or 'related to a case under' Title 11 (because) [t]hese references operate conjunctively to define the scope of jurisdiction." *In re Wood,* 825 F.2d 90, 93 (5th Cir.1987); ... Therefore, it is only necessary to determine if [a] ... claim is "related to" the Debtor's case.

*In re Feifer Industries,* 141 B.R. 450, 451–52 (Bankr.N.D.Ga.1991). *See also In re S & M Constructors, Inc.,* 144 B.R. 855, 859 (Bankr. W.D.Mo.1992).

1. We believe that Regent's assertion that it has not waived its right to a jury trial is the very weakest of all of its arguments. Contrary to Regent's reading of *In re Jackson,* 90 B.R. 126, 131–33 (Bankr.E.D.Pa.1988), *aff'd,* 118 B.R. 243 (E.D.Pa.1990), we clarify that we meant to hold, in that case, that the 10–day period for making a demand which appears in F.R.Civ.P. 38(b) should generally be applied in a bankruptcy proceeding. *Id.* at 132. It was only because we entered an Order extending the period to make such a demand to a later date certain that we held that a jury demand beyond the 10–day period was timely in that case. *Id.* at 132–33. No comparable facts are in issue here; Regent simply disregarded the 10–day or any other applicable time period.

Also, this court scheduled the trial on a must-be-heard basis on November 18, 1993, as of September 9, 1993. It must have been obvious to all of the parties, including Regent, that this court contemplated a bench trial on that date. We conclude, as we did in *In re Brenner,* 119 B.R. 495, 497 (Bankr.E.D.Pa.1990); and *In re Direct*

*Satellite Communications, Inc.,* 91 B.R. 7, 8–9 (Bankr.E.D.Pa.1988), that a party's delay in apprising the court of a desire for a jury trial, even if timely under F.R.Civ.P. 38(b), will be deemed a waiver of a right to a jury trial if the delay has seriously prejudiced other parties or seriously disrupted the court's schedule. The belated, reactive nature of Regent's jury demand, which would frustrate our conducting the trial on a long-established trial date and potentially delay the trial of the cause of the Plaintiff, would, in itself, have prompted us to find a waiver here.

As to the merits of the Astor Motion and Regent's belated cross-motion on its merits, we would have probably been inclined to deny them both. Too many questions remain as to the conduct of, particularly, Regent's employees in establishing Ganz's account there and in monitoring Ganz's large withdrawals. The fact that a possibly long trial of the Third-party Complaint would constitute most of the substance of the future courtroom activities in this proceeding enhance our sensitivity as to whether we have jurisdiction to hear it. *See* page 923 *infra.*

In the instant matter, Regent contends that this court lacks jurisdiction over the Third-party Complaint brought against it by the Astor Firm because the claim set forth therein does not meet any of the alternatives for exercise of jurisdiction set forth in 28 U.S.C. § 1334(b). Specifically, Regent requests dismissal of the Complaint because it (1) does not "arise under" Chapter 11, because the Complaint does not involve a claim made under a provision of that title: (2) does not "arise in" Chapter 11, because the issues do not involve administrative matters; and (3) does not "relate to" a Chapter 11 case, since it has no effect upon the Debtor's rights and liabilities.

The Astor Firm opposes the Motion to Dismiss. In support of its position and in opposition to that of Regent, the Astor Firm asserts that this court has jurisdiction over the Complaint because (1) it involves property of a debtor, and, as such, "arises in" Chapter 11; and (2) it involves the estate of the Debtor and the distribution of estate assets which are "related to" the bankruptcy.

A review of the Complaint indicates that the only possible basis for this court's jurisdiction is the "related to" provision, since it is clear that, although the main claim is indisputably core under 28 U.S.C. § 157(b)(2)(A) because it involves distribution of estate assets, the issues in the Third-party Complaint do not involve any right specifically created or provided for in Title 11. Furthermore, this dispute does *not* involve the administration of the Debtor's estate. That issue is resolved by our granting of the PSJ Motion at pages 917–921 *supra.* The Plaintiff makes no claim against Regent, a fact which it reiterates in its brief submission relevant to the Dismissal Motion and makes clear that this omission was not accidental. Rather, the matters at issue in the Third-party Complaint are confined to the alleged liability of Regent with or over to the Astor Firm in light of the Astor Firm's established liability for the embezzlement of the Debtor's funds by Ganz.

The test for determining the "related to" jurisdiction was thusly set forth by this circuit in *Pacor Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984):

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* (citations omitted). Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

This "effect upon the bankruptcy" test has been adopted by a majority of the courts addressing the "related to" basis for jurisdiction. *See, e.g., In re Cuyahoga Equipment Corp.,* 980 F.2d 110, 114 (2nd Cir.1992); *In re Gallucci,* 931 F.2d 738, 741 (11th Cir. 1991); *In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988); *In re Titan Energy, Inc.,* 837 F.2d 325, 329–30 (8th Cir.1988); *Wood, supra,* 825 F.2d at 95; *In re Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.1987); *In re Salem Mortgage Co.,* 783 F.2d 626, 634 (6th Cir.1986); and *In re Bobroff,* 766 F.2d 797, 802 (3rd Cir.1985). Moreover, in *In re Selig,* 135 B.R. 241, 245 (Bankr.E.D.Pa.1992); and *In re City Wide Press, Inc.,* 107 B.R. 68, 71–72 (Bankr. E.D.Pa.1989), this court further explained that only a slight or an insubstantial effect on the debtor's estate would most probably not suffice to establish subject-matter jurisdiction.

In assessing whether the third-party complaint in issue has an "effect upon" the Debtor's bankruptcy, this court has reviewed numerous cases which applied this test in connection with third-party complaints. A review of such cases reveals that a vast majority of the cases find that "related to" jurisdiction ·is lacking in connection with third-party complaints, and those that do not are factually distinguishable. Jurisdiction denied: *In re Alpha Steel Co.,* 142 B.R. 465, 470–72 (M.D.Ala.1992); *In re Spaulding & Co.,* 131 B.R. 84, 88–90 (N.D.Ill.1990); *In re Marine Iron & Shipbuilding Co.,* 104 B.R. 976, 984–87 (D.Minn.1989); *S & M Constructors, supra,* 144 B.R. 855, 859–64; *In re Pearson*

*Industries, Inc.,* 142 B.R. 831, 849–50 (Bankr.C.D.Ill.1992); *Feifer Industries, supra,* 141 B.R. at 452–53; *In re Pettibone Corp.,* 135 B.R. 847, 849–52 (Bankr.N.D.Ill. 1992); *In re Chambers,* 125 B.R. 788, 792–94 (Bankr.W.D.Mo.1991); *In re German,* 97 B.R. 373, 375 (Bankr.S.D.Ohio 1989); *In re Maislin Industries, U.S., Inc.,* 75 B.R. 170, 173–74 (Bankr.E.D.Mich.1987); and *In re John Peterson Motors, Inc.,* 56 B.R. 588, 592–93 (Bankr.D.Minn.1986). Jurisdiction found present: *In re Salem Mills, Inc.,* 148 B.R. 505, 510 (Bankr.N.D.Ill.1992); *In re Eads,* 135 B.R. 387, 397–98 (Bankr.E.D.Cal. 1991); and *In re Direct Satellite Communications, Inc.,* 91 B.R. 5, 6–7 (Bankr.E.D.Pa. 1988).

The facts of the cases in which the courts chose to exercise jurisdiction over third-party complaints were clearly distinct from those of the instant case. In *Salem Mills,* the third-party defendant was itself a claimant against the debtor and hence the dispute raised in the third-party complaint there was found to be in substance an objection to that claim. 148 B.R. at 510. In *Eads,* the claims set forth in the third-party complaint were found not to predominate over the primary claims. 135 B.R. at 397. In *Direct Satellite,* the third-party claims were found to be clearly subordinate to the main claims. By way of contrast, especially after our decision on the PSJ Motion, the instant third-party claims will not only predominate over the main claims, they will constitute the entire remaining disputed substance of the case.

In *Direct Satellite, supra,* this court exercised its pendent jurisdiction to hear the third-party claims in issue, based upon analysis of the considerations expressed in *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); and 3A J. MOORE, FEDERAL PRACTICE, ¶ 18.07, at 18–65 to 18–66 (2d ed. 1993). These considerations, some of which are now codified by, and supplemented by others in, 28 U.S.C. § 1367(c), are whether the main federal claim is substantial, whether the pendent claim arises out of the same nucleus of operative facts as the main claim, whether the pendent claim raises a novel issue of law,

and whether the pendent claim predominates over the main federal claim.

Some courts have questioned whether bankruptcy courts have any powers of pendent or ancillary jurisdiction at all. *See Alpha Steel, supra,* 142 B.R. at 471–72; *Pettibone Corp., supra,* 135 B.R. at 851–52; and *Chambers, supra,* 125 B.R. at 794. Most courts, like this court in *Direct Satellite, supra,* hold that such jurisdictional powers exist, but that they are not to be exercised except where it is clearly appropriate to do so under the considerations set forth in the foregoing paragraph. *See Marine Iron, supra,* 104 B.R. at 985–87; *Feifer Industries, supra,* 141 B.R. at 452–53; *Eads, supra,* 135 B.R. at 396–97; and *Peterson Motors, supra,* 56 B.R. at 592–93.

■ In the instant factual setting, two of the most important of the *Gibbs* § 1367(c) considerations are not present. The operative facts relative to the third-party claims of the Astor Firm will clearly not have to be developed to decide the main claim. The pendent claims would, at this stage, predominate over the core bankruptcy claims set forth in the Plaintiff's main claim.

■ We refuse to accept the Astor Firm's argument that, since the main case is core and the third-party claim concerns property of the Debtor's estate, this court automatically has jurisdiction over the third-party claims. Non-related claims arising in core proceedings are not thereby transformed into core claims themselves. As the *Selig* decision makes clear, 135 B.R. at 245, the fact that non-debtors have a dispute about their rights in property of the debtor's estate does not create jurisdiction unless that dispute will affect the debtor's rights in that property. While post-petition disputes which affect the rights of the debtor's estate may, in many circumstances, be deemed core proceedings, *see In re Arnold Print Works, Inc.,* 815 F.2d 165, 168–71 (1st Cir.1987); *Valley Forge Plaza Associates v. Fireman's Fund Ins. Co.,* 107 B.R. 514, 517–18 (E.D.Pa.1989); *In re West Electronics, Inc.,* 128 B.R. 900, 903–04 (Bankr.D.N.J.1991); and *In re 222 Liberty Associates,* 110 B.R. 196, 199 (Bankr. E.D.Pa.1990), we have already noted that the resolution of the instant third-party com-

plaint will have no effect on the main claim of the Plaintiff in this proceeding on behalf of the Debtor's estate.

Since we conclude that we have no jurisdiction to hear this proceeding under 28 U.S.C. § 1334(b) and that it would be inappropriate to invoke our pendent jurisdiction to hear the third-party claims of the Astor Firm against Regent, we must dismiss the Astor Firm's Third-party Complaint against Regent.

As we noted at the outset of this Memorandum, at page 914 *supra*, we acknowledge that the sum total of our decisions on the PSJ Motion and the Dismissal Motion results in a decision that the Astor Firm is liable to the Plaintiff, but that it cannot obtain any redress in this court against Regent. This result is unfortunate, but it is not shocking to our conscience. The matter of Ganz, whose embezzlements from this estate involve only about a quarter of his thefts, reflects a sad commentary on the morals of a small number of members of our bar and the limitations on the abilities of other members of the bar, the United States Trustee's office, and of this court to prevent such incidents from occurring. It would be bad enough if Ganz's situation represented the only example of such egregious wrongdoing by a member of our bar. However, we recently learned of another series of incidents involving another individual who, like Ganz, was never suspected of wrongdoing until it was discovered that he stole large sums of money coming into his hands in his role as counsel for debtors in bankruptcy cases.

All of us arguably share at least some of the blame for these incidents, although we are somewhat at a loss in identifying precisely what steps this court could have taken to prevent them short of requiring a costly and time-consuming audit process in this and all other Chapter 11 cases. We are still somewhat amazed that the Plaintiff apparently never missed the $500,000+ embezzled by Ganz from the amount to be distributed to its constituents until presumably Ganz himself divulged that he had taken it. However, public policy demands that at least the initial liability for these incidents must fall on the firms who have hired these individuals. Oth-

er incidents are clearly less likely to recur if firms have strong incentives to put checks and balances over all of their partners into their administrative systems. This is the lesson which we believe was conveyed in *Menichini v. Grant,* 995 F.2d 1224 (3rd Cir. 1993), where the court placed a duty to instill checks and balances on a key employee on a very small firm providing support services to attorneys and law firms. The resources available to establish necessary checks and balances are much greater in a large or even modestly-sized law firm.

We note that the Plaintiff, perhaps to maximize insurance coverage or for other tactical reasons, has, in the PSJ Motion, not sought summary judgment against any individuals, including even Ganz himself, as well as any of the individual law-partner defendants. We wish to acknowledge that there is no evidence that Ganz had any accomplices. Dubroff, though forced to acknowledge that his effecting the most modest of check systems, such as his reviewing the Provident bank statements reflecting Ganz's withdrawals, could have nipped Ganz's embezzlements in their earlier, less critical stages, has proven to be honest and quite honorable in helping to bring facts relevant to Ganz's actions to light. It is regretful that he and other equally innocent parties have been besmirched and placed into financial jeopardy by Ganz's totally despicable and apparently unexpected actions. However, Ganz's depositions suggests that he shared his distress over some of his financial difficulties which apparently led to his actions with the senior, semi-retired founder of the Pincus Firm, Erwin L. Pincus, Esquire. With hindsight, we can say that "trouble signs" were conveyed to those closest to the wrongdoer. Such signs cannot be disregarded. Public policy demands that those closest to the wrongdoer, having the most access to their "trouble signs," must bear the initial financial brunt of those wrongdoings. Partners come together to share the fruits of their labors. They must be prepared to accept the risk of a sour harvest.

## D. CONCLUSION

An Order consistent with the conclusions expressed in this Memorandum will accordingly be entered.

### ORDER

AND NOW, this 16th day of November, 1993, upon consideration of the Plaintiff's Motion for Partial Summary Judgment ("the PSJ Motion") in its favor against Defendant ASTOR, NEWMAN & WEISS ("the Astor Firm"), and the Motion of REGENT NATIONAL BANK ("Regent") to Dismiss Third–Party Complaints for Lack of Subject Matter Jurisdiction, or Alternatively, to Stay the Adversary Proceeding Pending Determination of Regent National Bank's Motion to Withdraw Reference ("the Dismissal Motion") in this proceeding, presently scheduled for trial on November 18, 1993, it is hereby ORDERED AND DECREED as follows:

1. The PSJ Motion is GRANTED.

2. Judgment is entered in favor of the Plaintiff and against Astor as to liability. Astor is liable to the Plaintiff for all funds of the Debtor's estate collected and personally retained by Defendant JONATHAN H. GANZ on or before August 1, 1991.

3. The Dismissal Motion is GRANTED in part.

4. The Third-party Complaints of the Astor Firm and the Rawle Firm against Regent are DISMISSED for want of jurisdiction.

5. All other aspects of the Dismissal Motion, as well as all other claims relevant to the Third-party Complaint, are DENIED as moot.

6. This proceeding remains scheduled for a bench trial of any remaining issues on a must-be-tried basis on

THURSDAY, NOVEMBER 18, 1993, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.